## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY,
962 Wayne Ave., Suite 610
Silver Spring, MD 20910

ATCHAFALAYA BASINKEEPER,
47 Mt. Laurel Ave.
Birmingham, AL 35242

SIERRA CLUB and its DELTA CHAPTER,
2101 Webster St., Suite 1300
Oakland, CA 94612

THE LOUISIANA CRAWFISH
PRODUCERS ASSOCIATION-WEST,
1020 Serrette St.
Henderson, LA 70517

RONALD M. NOWAK,
2101 Greenwich St.,
Falls Church, VA 22043

MICHAEL J. CAIRE
117 Parkwest Dr.
West Monroe, LA 71291

HAROLD SCHOEFFLER,
3502 Simcoe East
Lafayette, LA 70501

　　　　　*Plaintiffs,*

vs.

RYAN ZINKE, in his official capacity as
Secretary, U.S. Dep't of Interior,
1849 C St., N.W.
Washington, D.C. 20530

and

CA No. 18-1547

GREG SHEEHAN, in his official capacity as
Acting Director, U.S. Fish and Wildlife
Service,
1849 C St. N.W. Room 3331
Washington, D.C. 20240

       *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Public Employees for Environmental Responsibility ("PEER"), Atchafalaya

Basinkeeper ("ABK"), Sierra Club and its Delta Chapter, the Louisiana Crawfish Producers

Association-West ("LCPA"), Ronald M. Nowak, Michael J. Caire, and Harold Schoeffler

challenge the U.S. Fish and Wildlife Service's ("FWS") March 2016 delisting of the Louisiana

black bear (*Ursus americanus luteolus*) from the U.S. List of Endangered and Threatened

Wildlife under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.  See* 81 Fed. Reg.

13124 (March 11, 2016).

## INTRODUCTION

1.      This is an action for declaratory judgment and injunctive relief to remedy

violations of the Endangered Species Act ("ESA"), (16 U.S.C. § 1531*, et seq.*) and

implementing regulations (50 C.F.R. § 420.01, *et seq.*), and the Administrative Procedure

Act ("APA") (5 U.S.C. § 551, *et seq.*).  These violations were caused by Defendants' actions

in (1) removing the Louisiana black bear from the U.S. List of Endangered and Threatened

Wildlife, (2) removing its legally designated critical habitat, and (3) failing to make the

determinations to take these actions based on the "best scientific and commercial data

available." 16 U.S.C. § 1533(b)(1)(A). Plaintiffs are organizations and individuals whose

interests have been adversely affected by FWS's March 2016 delisting of the Louisiana black

bear.

2.      At the time of the Louisiana black bear's listing as a threatened species under the ESA, the subspecies had been declining for the past 200 years and probably numbered fewer than 150 individuals. The listing likely saved the bear from extinction.  However, failure to use the best scientific data available and reliance on faulty scientific assumptions erroneously led to the delisting of the bear despite the fact that it has not achieved recovery. The delisting presents a continuing threat to the viability of the Louisiana black bear and its habitat. Plaintiffs seek invalidation of the decision to delist the bear and remove its critical habitat designation, resulting in reinstatement of the listing and critical habitat designation.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), § 2201 (authorizing declaratory relief), § 2202 (authorizing injunctive relief), 16 U.S.C. § 1540(c), (g) (ESA district court jurisdiction and citizen-suit provision), and 5 U.S.C. § 702 (providing for judicial review of agency action under the Administrative Procedure Act). Defendants' sovereign immunity is waived by 16 U.S.C. § 1540(g) and 5 U.S.C. § 702. Attorneys' fees and expenses, including expert witness fees, may be awarded under the ESA, 16 U.S.C. § 1540(g)(4), and under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

4.      Plaintiffs have provided more than sixty (60) days' written notice of the violations alleged herein pursuant to 16 U.S.C. §1540(g)(2).

5.      Venue lies in this judicial district pursuant to 16 U.S.C. § 1540(g)(3)(A) (where the violation occurs) and 28 U.S.C. § 1391(e) (actions against an officer or employee of the United States may be brought where a defendant resides, where plaintiffs reside, or where a substantial part of the events or omissions occurred).  The challenged delisting decision was

taken by the then Acting Director of the U.S. Fish and Wildlife Service, Department of

Interior, which is headquartered in Washington, D.C.  Plaintiff Public Employees for

Environmental Responsibility is incorporated in Washington, D.C.

6.      Declaratory relief is authorized by 28 U.S.C. § 2201 and the Federal Rules of

Civil Procedure (Fed. R. Civ. P. 57). Injunctive relief is authorized by 28 U.S.C. § 2202 and

the Federal Rules of Civil Procedure (Fed. R. Civ. P. 65).

**PARTIES**

7.      Plaintiff Public Employees for Environmental Responsibility ("PEER") is a

501(c)(3) nonprofit organization incorporated in Washington, D.C. PEER's organizational

purposes include assuring the enforcement of federal and state laws aimed at protecting

endangered and threatened species and ensuring the use of adequate scientific research,

analysis, and data in agency decision-making.  PEER has members who engage in scientific

study of the Louisiana black bear and who enjoy observing the Louisiana black bear in its

natural habitat.

8.      The Sierra Club is a national nonprofit organization with sixty-seven (67)

chapters and more than 802,000 members dedicated to exploring, enjoying, and protecting

the wild places of the earth; to practicing and promoting the responsible use of the earth's

ecosystems and resources; to educating and enlisting humanity to protect and restore the

quality of the natural and human environment; and to using all lawful means to carry out

these objectives. The Delta Chapter of the Sierra Club has approximately 3,200 members in

the state of Louisiana whose recreational, aesthetic, business, and environmental interests

have been, are being and will be adversely affected by the delisting of the Louisiana black

bear. Members of the Sierra Club live, work, and recreate in the area around the Atchafalaya

Basin, and use its waterways and the surrounding areas for recreation, scientific study, fishing, and a variety of other activities, including observation and study of the Louisiana black bear.

9.      Atchafalaya Basinkeeper ("ABK"), founded in 2004, is a 501(c)(3) nonprofit organization incorporated under the laws of Louisiana. ABK works to preserve and restore the ecosystems of the Atchafalaya Basin for future generations. ABK is a proud member of Waterkeeper Alliance, an international grassroots advocacy organization of over 300 programs working to protect watersheds across the globe. Locally, ABK works diligently to protect the long-term health and sustainability of the Atchafalaya Basin. ABK has over 1,100 members, including members who live in the Atchafalaya Basin, who work in the Basin, and who recreate and enjoy the diverse ecosystems represented in the Basin, including by observation of the Louisiana black bear.

10.     Dean Wilson has served as the Executive Director and appointed Basinkeeper of ABK since its inception in 2004. Mr. Wilson is a 30-year resident of Plaquemine, Louisiana in Iberville Parish and within the Atchafalaya Basin. Mr. Wilson is also the owner of Last Wilderness Swamp Tours. The bear's presence and habitat in the swamps creates a major draw for ecotourism in the Basin, and therefore supports Mr. Wilson's business.

11.     The March 2016 delisting of the Louisiana black bear has harmed the interests of the Sierra Club and its Delta Chapter, ABK, and their members in protecting the Basin. The delisting has had a direct negative impact on ABK, its members and its Executive Director's interest in the Atchafalaya Basin. The delisting impacts the protections for Louisiana black bears in the Lower Atchafalaya River Basin population and the ecosystems they depend on, which has repercussions on ecotourism as well as on the protections employed in the Basin to

ensure the longevity of the Louisiana black bear subspecies. For example, the delisting resulted in the removal of critical habitat designations in the Atchafalaya Basin. These areas were protected from development projects that not only impair bear habitat but also surrounding waters and ecosystems. As a result, ABK is concerned that the delisting will have an adverse impact on the Basin's ability to serve as viable habitat for the Lower Atchafalaya River Basin population of Louisiana black bears, as well as an adverse impact on the overall productivity of the wetlands and ecosystems in the Atchafalaya Basin.

12.     The Louisiana Crawfish Producers Association-West ("LCPA") is a nonprofit organization incorporated under the laws of Louisiana. LCPA works to protect the economic, environmental, and cultural interests of the Atchafalaya Basin and its residents and to promote a healthy habitat for the crawfish, fish, and other wildlife that the Basin supports. Additionally, LCPA works to protect and ensure public access to the waters of the United States within the Basin. LCPA works to ensure that the state and federal laws and regulations intended to preserve and enhance the Basin's natural resources and wildlife are followed. LCPA has approximately 500 members, including recreational and commercial fishermen, hunters and recreationists who live, work, and recreate in and around the Basin. These members regularly use the Basin in pursuit of these interests, including the areas impacted by the 2016 delisting of the Louisiana black bear that removed its critical habitat designation.

13.     LCPA President Jody Meche is a third-generation Cajun crawfisherman who has been making a living in the Basin his entire life. Meche, like many members of LCPA who were born and raised in the Basin, works and lives in the geographic area of the Lower Atchafalaya River Basin Louisiana black bear population's habitat. The organization's members have long observed and captured on game cameras the presence of the black bear in

the Basin. LCPA's interests in ecotourism and wetlands protection are impacted by the delisting of the Louisiana black bear. As more development is authorized in areas previously designated as critical habitat, the ability of crawfishermen to make a living in areas with exacerbated sedimentation, impaired water quality, and disruption of crawfish and other wildlife habitat is severely diminished. LCPA's members intend to continue using the Basin to advance their economic, recreational, cultural, and aesthetic interests, including bear sightings in the Basin and protection of areas formerly designated as critical habitat for the Louisiana black bear.

14.     Ronald M. Nowak is a Louisiana native and current resident of Virginia, who has spent much time in Louisiana and elsewhere gathering information on the Louisiana black bear. He is a PhD. biologist and has authored eleven (11) books on mammals, mostly with Johns Hopkins University Press, several of which discuss the Louisiana black bear.  He was staff mammalogist at the Office of Endangered Species, U.S. Fish and Wildlife Service, from 1974 to 1987, during which time, as part of his duties, he did several surveys and reports on the Louisiana black bear and other kinds of bears.  Prior and subsequent to that time, he also was contracted by the Service to do studies of wolves and cougars. He makes periodic visits to Louisiana, where he attempts to observe and study the Louisiana black bear and its habitat, and his enjoyment and ability to conduct scientific studies on future visits would be diminished if the subspecies were to be reduced in numbers or distribution or if it were to undergo hybridization with an alien subspecies. Potential conservation measures that would result from returning the Louisiana black bear to the U.S. List of Endangered and Threatened Wildlife, re-designating its critical habitat, and protecting its genome from further hybridization would greatly enhance his plans for additional study and observation.

15.     Michael Jordan Caire, MD, is a Louisiana resident who has been actively involved with the Louisiana black bear.  He received a degree in Zoology from the University of North Carolina Chapel Hill and his MD from Louisiana State University Medical School in New Orleans. He has expertise and experience in evaluating the best available science.  Dr. Caire is a life member of the Black Bear Conservation Coalition.  He has received several awards for his work on the Louisiana black bear, including the Louisiana Wildlife Federation Volunteer Conservation Award and the Chevron Conservation Award.  Dr. Caire was active with the Tensas Conservancy Coalition, where his work led to the purchase of the Tensas National Wildlife Refuge (NWR) and the adjacent Big Lake Wildlife Management Area, which are the core habitats of the present Louisiana black bear subpopulation of the Tensas River Basin. Dr. Caire has been mentioned in the Congressional Record citing his work in the establishment of the Tensas NWR and in the protection of the Louisiana black bear.  Dr. Caire has a long history of undertaking efforts to restore the Louisiana black bear. Dr. Caire's involvement with the Louisiana black bear will continue into the future, as he intends to continue studying bear issues, including conservation, and visiting and observing bear habitat. Reversing the delisting would greatly enhance his plans for additional study and observation.

16.     Harold Schoeffler is a longtime resident of Lafayette, Louisiana with a long-term interest in the survival of the Louisiana black bear and the protection of its habitat.  Mr. Schoeffler has a long history of involvement in efforts to conserve the bear and protect its habitat, including spending decades of time and effort seeking to have the Secretary of the Interior protect the bear under the ESA. In 1987, Mr. Schoeffler personally drafted a citizens' petition to have the bear listed as a threatened species under the ESA. Mr. Schoeffler believes

preserving the Atchafalaya Basin is vital to saving the bear because the region is some of the bear's best remaining habitat. Mr. Schoeffler uses the Atchafalaya Basin on a regular basis, four or five days a week, for fishing, crabbing, canoeing, and hunting; and he will continue to do so.

17.     PEER, Sierra Club and its Delta Chapter, Atchafalaya Basinkeeper, and the Louisiana Crawfish Producers Association-West have standing to bring this lawsuit because they are organizations whose members would have standing to sue on their own and because the interests at stake are germane to the organizations' purposes, as set out above.

18.     Specifically, the delisting of the Louisiana black bear causes damage to these organizations' members' aesthetic, scientific, and recreational interests.  By delisting the Louisiana black bear, the FWS is harming the organizational plaintiffs' and their members' interests by subjecting the bear and its habitat to potential threats caused by the erroneous delisting of the bear. Thus, the organizational plaintiffs have standing to sue under the ESA on behalf of their members.

19.     In addition, the individual plaintiffs, Ronald M. Nowak, Michael J. Caire, and Harold Schoeffler, have standing to sue based on their scientific, aesthetic, and recreational interests described above.

20.     Defendant Ryan Zinke is the Secretary of the U.S. Department of the Interior. The Secretary of the Interior is the federal official vested with responsibility for properly carrying out the ESA with respect to mammals such as the Louisiana black bear. Defendant Zinke is sued in his official capacity.

21.      Defendant Greg Sheehan is the Acting Director of the U.S. Fish and Wildlife Service, which has the direct responsibility for carrying out the ESA with respect to

mammals such as the Louisiana black bear.  A prior Acting Director, James W. Kurth, signed the delisting decision at issue here.

## LEGAL FRAMEWORK

### The Endangered Species Act

22.     The purposes of the ESA include "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA achieves this goal by authorizing the Secretary of the Interior to determine "whether any species is an endangered species or a threatened species" as a result of habitat destruction, overutilization of the species, predation or disease, inadequate regulatory structures, or any other natural or manmade factors affecting the species' continued existence. § 1533(a)(1)(A)-(E).

23.     The term "species" under the ESA includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature," § 1532(16), such as the Louisiana black bear.

24.     FWS is also required to reconsider the classifications of species and change them if warranted based on new information. *See* § 1533(c)(1) (requiring FWS to revise the List of Endangered and Threatened Wildlife "from time to time."). The status of each listed species must be reviewed every five years. § 1533(c)(2)(A), (B). In that review, the Secretary is to determine whether the species should be removed from the list, or changed from endangered to threatened, or from threatened to endangered. § 1533(c)(2)(B).

25.     Concurrent with making a determination that a species should be listed as endangered or threatened, the Secretary must also "designate any habitat of such species which is then considered to be critical habitat." § 1533(a)(3)(A).

26.     The ESA defines "endangered species" to include "any species which is in danger of extinction throughout all or a significant portion of its range." § 1532(6).

27.     The ESA defines "threatened species" to include "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." § 1532(20).

### Listing of Threatened or Endangered Species

28.     The ESA also establishes standards by which the Secretary is directed to categorize a species. In making determinations as to whether a species should be listed as endangered or threatened, the action should be taken "solely on the basis of the best scientific and commercial data available." § 1533(b)(1)(A); *see* 50 C.F.R. § 424.11(b).

29.     Designations of critical habitat must also be based on the "best scientific data available." 16 U.S.C. § 1533(b)(2).

### Delisting of Threatened or Endangered Species

30.     When the Secretary removes a species from the Federal Lists of Endangered and Threatened Wildlife and Plants, or "delists" a species, s/he is required to make a determination that the threats that merited listing in the first place have been eliminated or controlled. *See* 16 U.S.C. § 1533(a) – (c); 50 C.F.R. § 424.11(d).

31.     Specifically, the factors to be considered for delisting are the same as those for listing: (1) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (2) overutilization for commercial, recreational, scientific, or educational

11

purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms

protecting the species or habitat; and (5) other natural or manmade factors affecting its

continued existence. 16 U.S.C. § 1533(a)(1), (c); 50 C.F.R. § 424.11(c), (d). The ESA

dictates that the presence of any one of the five factors shall serve as the basis for protection

of a species. 16 U.S.C. § 1533(a)(1) (determination to be made based on any of the five

factors).

32.     A species may be delisted based upon considerations of these five factors <u>and</u>

only if "the best scientific and commercial data" substantiate that it is no longer endangered

or threatened for one of the following reasons: extinction, recovery, or if the original data

underlying the listing are found to be in error.  50 C.F.R. § 424.11(d). (emphasis added).

33.     To merit protection under the ESA, the species need not be endangered or

threatened throughout all of its range if it is endangered or threatened in a significant portion

of its range.  The fact that a species is viable in some portion of its range does not mean that

the species as a whole is not threatened or endangered. 16 U.S.C. §§ 1532(6); 1532(20).

34.     The ESA directs the Secretary to develop and implement "recovery plans" for the

conservation and survival of endangered and threatened species, including subspecies and

certain populations.  16 U.S.C. § 1533(f).  Recovery plans are to contain management actions

to achieve the plan's goal for the conservation and survival of the species, and include

criteria, which, when met, would result in a determination that the species should be removed

from the list.  *Id.*

35.     However, as acknowledged in the delisting rule, recovery plans are not regulatory

documents and cannot substitute for determinations and promulgations of regulations. The

ESA has no definition or criteria for what constitutes "recovery."  Therefore, achievement of

the goals of a recovery plan does not necessarily mean that the statutory standards for delisting have been met.

36.     The ESA provides that the rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553, apply to regulations promulgated under the ESA such as the delisting rule at issue here. 16 U.S.C. § 1533(b)(4).

### Citizen Suits under the ESA

37.      The ESA provides a private right of action in the form of citizen suits whereby individual citizens may bring suit against violators of the ESA or against the Secretary for failing to perform non-discretionary duties required by the ESA. *See* 16 U.S.C. § 1540(g).

38.     Any person may commence an action in district court to enjoin any person, including the government agencies, for violations under the ESA. § 1540(g)(1)(A).  The statute also provides for citizen suits when the Secretary fails to comply with the requirements of § 1533, which addresses determinations concerning the status of species as threatened or endangered.  16 U.S.C. § 1540(g)(1)(C).

### Administrative Procedure Act

39.     The Administrative Procedure Act ("APA") enables a person adversely affected or aggrieved by agency action to seek judicial review thereof. 5 U.S.C. § 702.

40.     Under the APA, a court will set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### FACTUAL ALLEGATIONS

41.     The Louisiana black bear (*Ursus americanus luteolus*) is one of sixteen (16) recognized subspecies of the American black bear (*Ursus americanus*), which is the official

13

state mammal of Louisiana and an iconic emblem of American culture and heritage. While

the black bear historically was found across North America, the Louisiana black bear

subspecies is only known to have occurred in Louisiana, eastern Texas, southern Arkansas,

and most of Mississippi.

42.     Compared to other American black bears, the Louisiana black bear's skull is

relatively longer, narrower, and flatter, with large molar teeth. *Luteolus* has been reported to

be a relatively large subspecies of black bear. Adult males can weigh more than 600 pounds.

43.     Before large-scale human development, the Louisiana black bear had an overall

range of at least 120,000 square miles, including at least 80,000 individuals.  However, by

the 1950s, only 80 to 120 Louisiana black bears were estimated to remain in Louisiana, and

fewer than 25 were estimated to remain in Mississippi at the time of listing in 1992.  The

Texas population had been exterminated. Thus, well under one percent of historic numbers

remained.

44.     On January 7, 1992, the Louisiana black bear was listed as threatened pursuant to

the ESA.  57 Fed. Reg. 588 (January 7, 1992).  The listing was based primarily on the

historical modification and reduction of bear habitat, the reduced quality of the remaining

habitat due to fragmentation, and the threat of future habitat conversion and human-related

mortality.  The listing decision stated that listing was warranted on the basis of past habitat

loss alone.

45.     The listing decision found that suitable habitat for the Louisiana black bear had

been reduced by eighty percent as of 1980, and that the remaining habitat was reduced in

quality by fragmentation due to human activity, thereby stressing the remaining populations.

Bottomland forest habitat was continuing to be cleared. It should be noted that while suitable

habitat had been reduced by eighty percent, the bear itself had been eliminated from much of the remaining suitable habitat, so it actually occupied only about two percent of its original habitat of at least 120,000 square miles.

46.     The listing decision also determined to list all other subspecies of the species *Ursus americanus* within the Louisiana black bear's range (Louisiana, Mississippi, and Texas) as look-alike species pursuant to the look-alike provisions of ESA.  FWS noted that there might be bears of the subspecies *Ursus americanus americanus*, descended from Minnesota animals that had been introduced within the range of the Louisiana black bear in the 1960s for sport hunting purposes.  Those bears could not always be distinguished from the native subspecies, particularly in the field.  FWS therefore expressed concern that it would be difficult to enforce protection of the Louisiana black bear from human-induced mortality, without also protecting the other subspecies.

47.     The listing decision noted that there was some controversy over whether the Louisiana black bear subspecies was validly distinct from other subspecies of black bears. However, FWS concluded that there was a morphological distinctiveness and that the Louisiana black bear was a valid subspecies qualified for listing.  Specifically, FWS concluded in its 1992 listing of *U. a. luteolus* that "the only practical means available for protecting any possibly remaining unique genetic material originally belonging to the native *U. a. luteolus* would be through listing and protecting the taxon now distinguished by cranial features as *U. a. luteolus.*" 57 Fed. Reg. at 592.  Although FWS reported at the time of listing that morphology supported the validity of *luteolus*, while genetic issues were unsettled, a later detailed genetics study by Laufenberg and Clark, funded in part by the FWS and the most oft-cited document used in developing the delisting, provided clear evidence that native

populations of *luteolus* had maintained genetic distinction. The 2016 delisting decision reaffirmed that FWS still considers the Louisiana black bear to be a distinct subspecies. Even if the Louisiana black bear (*luteolus*) were not recognized as a full species or subspecies, it would still be eligible for listing under ESA as a "distinct population segment." 16 U.S.C. § 1532(16).

48.     A recovery plan for the Louisiana black bear was issued on September 27, 1995. It contained four main recovery actions: (1) restoring and protecting bear habitat; (2) developing and implementing information and education programs; (3) protecting and managing bear populations; and (4) conducting research on population viability, corridors, and bear biology.

49.     The recovery criteria in the recovery plan included:  two viable "subpopulations," one in each of the Tensas and Atchafalaya River Basins, immigration and emigration corridors between the two viable "subpopulations," and long-term protection of the habitat and interconnecting corridors that support each of the two viable "subpopulations."

50.     On March 10, 2009, the FWS published a final rule designating critical habitat for the Louisiana black bear.  74 Fed. Reg. 10349 (March 10, 2009).

51.     As recently as February 18, 2014, FWS completed an extensive 5-year review of the status of the Louisiana black bear that concluded the subspecies should remain listed as threatened.[1]

---

[1] Deborah Fuller, Louisiana black bear (*Ursus americanus luteolus*) 5-Year Review:  summary and evaluation, Louisiana Ecological Services Field Office, U.S. Fish and Wildlife Service, Lafayette, Louisiana (2014).

52.     Yet, just over a year later, FWS proposed delisting the Louisiana black bear. 80 Fed. Reg. 29394 (May 21, 2015).

53.     In the delisting proposal and in the final delisting rule, FWS recognized that the Louisiana black bear, *Ursus americanus luteolus,* was a subspecies of the American black bear, *Ursus americanus,* distinct from two other subspecies also occurring in the southeastern United States, *Ursus americanus americanus* (American black bear) and *Ursus americanus floridanus* (Florida black bear).

54.     FWS issued the final delisting rule on March 11, 2016, three years before the next 5-year review was due, based on a finding that the species had recovered.  81 Fed. Reg. 13124 (March 11, 2016). This decision relied on claims that over 312 square miles of bear habitat had been restored or permanently protected and that the recovery goal of two viable populations connected by a secure corridor had purportedly been met.

55.     The delisting decision also removed from the List of Endangered and Threatened Wildlife the other subspecies of the American black bear that had been listed within the historical range of the Louisiana black bear due to similarity in appearance.

56.     In the final delisting decision, FWS identifies four main areas of Louisiana that are inhabited by black bears: Tensas River Basin ("TRB"), Three Rivers Complex ("TRC"), Upper Atchafalaya River Basin ("UARB"), and Lower Atchafalaya River Basin ("LARB").

57.     Only the TRB and LARB contain populations (FWS uses the term "subpopulations") of the native subspecies (*luteolus*) that have been continually present in those areas.

58.     The UARB contains an introduced, non-native population descended from black bears of another subspecies (*Ursus americanus americanus*) brought to the UARB from Minnesota in the 1960s to support game hunting.

59.     The Minnesota bears were shipped into the UARB by the Louisiana Wildlife and Fisheries Commission.  Based on historical accounts and the genetics study by Laufenberg and Clark, there appears to have been no Louisiana black bear population in the UARB at the time of introduction.

60.     According to Laufenberg and Clark, the current genetic makeup of the UARB bears more closely resembles that of Minnesota *americanus*, not *luteolus*.

61.     The TRC population did not exist at the time of original listing, but was formed as a result of a multi-year (2001-2009) translocation project by FWS as part of its effort to implement its recovery plan.  The TRC is located between the TRB and the UARB. According to the genetics study by Laufenberg and Clark, the TRC population is now composed largely of bears moved from the TRB and hybrids between TRB and UARB bears.

62.     At the time of delisting, FWS did not know how many bears were in the TRC population.

63.     The translocation project was intended to facilitate development of a connecting corridor between the TRB (occupied by the native *luteolus*) and the UARB (occupied by the introduced, non-native *americanus*).  It is now known, largely through the genetics study by Laufenberg and Clark, that there was previously no potential for natural dispersal of bears between the TRB and UARB.  In an effort to implement its recovery plan, FWS chose to bring about contact between the native TRB and alien UARB populations.  As further demonstrated by the Laufenberg and Clark study, such contact now has led to hybridization

of the TRB and UARB bears and to a critical new threat to the natural genome of the native

Louisiana black bear.

64.     While habitat loss from development has been relatively stabilized since the

Louisiana black bear was listed, habitat loss from climate change is increasing. Specifically,

habitat in the LARB is eroding into the Gulf.

65.     With regard to the LARB population, FWS acknowledged in the delisting

decision that it is the population at greater risk of extinction due to future anticipated

development and sea level rise. At the time of delisting, the LARB population was

experiencing a high degree of mortality from vehicular collisions and nuisance-related

removals.  The area it occupied had not increased since listing.

66.     The potential for interchange between the LARB and other populations is low –

i.e., it is isolated and not likely to expand based on interchange with other groups.  FWS does

not know the probability of long-term persistence of the LARB population, and does not base

its conclusions about the Louisiana black bear's viability on this population – i.e., the

potential for extinction for this population was found not to impact FWS's conclusion that

the species had recovered. The LARB is not considered a viable population upon which FWS

based its recovery conclusion.

67.     Based on the means of values provided in the delisting rule and a post-delisting

study in the TRC, the total number of free-living black bears within the original range of the

subspecies *luteolus* is approximately 700, including the non-*luteolus* UARB population.

That figure includes about 294 in the TRB, 164 in the LARB, 69 in the UARB, 90 in

Mississippi, and 73 in the TRC.  Prior to colonization, the overall range of *luteolus* would

have contained at least 80,000 bears; thus, current numbers are less than one percent of the historic figure.

68.     Based on data in the delisting rule, the current total breeding range of the Louisiana black bear (including the non-native UARB population) is 2,823 square miles (7,311 sq. km).  However, the original range of subspecies *luteolus* was at least 120,000 square miles (311,000 sq. km).  If the range of the UARB population (454 square miles or 1,176 sq. km) is excluded, the current overall range is just under two percent of the historic range.

69.     FWS took the arbitrary position in the delisting decision that comparisons between current and historic populations were not relevant to its determination that the Louisiana black bear had recovered.  FWS claimed that it was enough that the current population had "long-term viability" without reference to loss of historic numbers and range.

70.     At the time of delisting, the most significant causes of death in Louisiana and Mississippi were poaching and road kills, *i.e.* human-caused mortality.  Roads fragment bear habitat and increase the chances of vehicle collisions, increase human contact, decrease habitat use, and restrict bears' movement to other areas.

71.     Despite the primary causes of habitat loss and mortality being human caused, FWS claimed in the delisting decision that the subspecies as a whole, and specifically the TRB and UARB "subpopulations," are viable over the next 100 years.  In reaching this determination, FWS claimed that there is sufficient protected habitat to support breeding and movement of individuals between "subpopulations" so that the subspecies is not currently, and is not likely to again become, a threatened species.

72.     One of the major points relied upon by FWS in delisting the Louisiana black bear was the connection between populations in the TRB and the UARB via the TRC. However, the connection is erroneously relied upon because in fact the UARB population does not consist of the subspecies *luteolus*. The connection of the UARB population with Louisiana black bear populations should not be considered to constitute sufficient recovery, and in fact threatens the remaining Louisiana black bears with hybridization.

73.     Prior to the TRC translocations, FWS failed to adequately assess the genetic status and historic origin of the UARB bears, and failed to adequately assess the effects that the TRC translocations and resulting connection between the UARB and TRB might have on the native TRB population.  Such failure is further demonstration that the delisting, which was done partly on the grounds that the translocations had facilitated the connection, was not based on the best available science.

74.     On November 2, 2017 the Plaintiffs filed a 60-day Notice of Intent to Sue pursuant to 16 U.S.C. § 1540(g).

75.     By letter dated December 12, 2017, FWS responded to the Notice of Intent to Sue. The FWS stated that it stood by its decision to delist the Louisiana black bear.

## CLAIMS FOR RELIEF

**I.  First Claim for Relief – Violations of ESA with Respect to the Delisting Factors**

76.     Plaintiffs hereby re-allege and incorporate all previous paragraphs of this complaint.

77.     If any one of the five listing/delisting factors contained in Section 4(a)(1) of the Act is present, the ESA requires the Louisiana black bear remain listed.

78.     FWS violated the ESA by delisting the Louisiana black bear despite the fact that the best scientific data available does not "indicate that the population is no longer threatened," 50 C.F.R. § 424.11(d)(2), and by drawing conclusions about the factors for delisting without using the best scientific data available and that are arbitrary and capricious, an abuse of discretion, and not in accordance with law.

### Factor I. The Present or Threatened Destruction, Modification, or Curtailment of its Habitat or Range

79.     The Louisiana black bear does not in fact have the habitat or range claimed by FWS to support delisting, because not all of the bears FWS considers to occupy Louisiana black bear habitat are in fact of the *luteolus* subspecies, and the corridors claimed to be connecting different populations are inadequate to assure connectivity between true populations of *luteolus*.  Therefore, the analysis of this factor was not based on the best available scientific data and this factor does not support delisting.

80.     Under the FWS recovery plan for the Louisiana black bear (which itself was flawed and greatly insufficient to assure anything approaching true recovery), there were three major goals: establishment of two viable populations of Louisiana black bears in the Tensas and Atchafalaya River Basins; establishment of a secure corridor between these populations; and long-term protection of the corridors. Supposedly, if these criteria were met, *luteolus* would have adequate habitat and range to ensure its long-term survival as a subspecies.

81.     FWS declared recovery on the basis of the supposed viability of the TRB and UARB populations and the supposed establishment of a corridor between those two populations.  However, the UARB population does not consist of true Louisiana black bears, and connecting the TRB and the UARB will only result in further hybridization, rather than

recovery. FWS's attempts at connectivity through the TRC leaves the TRB population at great risk of hybridization and endangers the integrity of the native genome.

82.     Prior to establishment of the TRC population, FWS failed to adequately assess the genetic status and historic origin of the UARB bears, and failed to adequately assess the effects that the TRC translocations might have on the natural genome of the native TRB population.

83.     In order to actually meet its recovery plan criteria, FWS would have to demonstrate viability, not of the UARB population, which does not consist of *luteolus*, but of the LARB and TRB populations, and would have to demonstrate secure connectivity between the TRB and the LARB.  However, FWS does not claim to have demonstrated the viability of the LARB population, nor its connectivity to the TRB population.  Thus, there are not in fact two populations of Louisiana black bears that are securely connected, and the recovery plan criteria for habitat and range are not met.

### Factor 4. The Inadequacy of Existing Regulatory Mechanisms

84.     The premise of a delisting is that regulatory mechanisms outside of the ESA will be sufficient to protect the species.  This is not the case here, because even with ESA protections, the species has not yet achieved recovery, and it certainly cannot be expected to do so without ESA protection.

85.     The meaning of regulatory mechanisms in this context means currently existing, enforceable measures, and does not include voluntary, unenforceable measures or monitoring.

86.     In fact, there are continuing threats to the bear that will no longer be addressed with delisting.  For example, human caused mortality (hunting, vehicular mortality),

hybridization, and loss of habitat from climate change will all increase with both a delisting and the passage of time. There are no regulatory mechanisms in place to alleviate these threats.

87.     The delisting decision does not adequately address the critical status of the LARB population.  The probability of its long-term persistence is unknown, its distribution has not improved since the listing in 1992, and only 5.8% of its breeding habitat is protected.  It is potentially threatened by human development and sea level rise.  FWS did not address regulatory mechanisms that would eliminate or control these threats.

88.     Specifically, without ESA protection, continued human-caused impacts, including hybridization and lack of protected habitat will continue to threaten the existence of the Louisiana black bear.

89.     When FWS delisted the Louisiana black bear, the Agency also removed the critical habitat designation protecting 1,868 square miles of the bear's range.  That designation had been made only six years before the proposal to delist.  It delineated an area in which actions authorized, funded, or carried out by the federal government were subject to scrutiny, pursuant to Section 7 of ESA, to insure they would not adversely affect the bear. Not having such scrutiny obviously was one of the factors threatening the bear, because it was considered legally necessary to designate the critical habitat area where such scrutiny would apply.  Now, all actions that previously would have been subject to scrutiny may proceed unchecked.

90.     Without the protections stemming from the listing and critical habitat designation, human development will continue to encroach upon the bear's natural habitat, there will be less control of illegal killing, climate change will threaten the LARB population, and the

ominous hybridization process will continue to spread unchecked. Slight recoveries in population will not be able to reverse the trend toward extinction that existed before the listing of the Louisiana black bear.

**Factor 5. Other Natural or Manmade Factors Affecting its Continued Existence**

91.     FWS also failed to account for the potential for human-induced risk of hybridization between the Louisiana black bear (subspecies *luteolus*) and other subspecies of the American black bear.  Consideration of this factor must include a prediction of future negative effects of anticipated conditions or human actions.  FWS made no such predictions.

92.      As illustrated in the Laufenberg and Clark study, which FWS states was the factor that initiated work on the delisting decision, there used to be distinct populations in the TRB, UARB, and LARB. The TRB and LARB populations each contained genetically distinctive groups of Louisiana black bears; however, the bears in the UARB are genetic descendants of *Ursus americanus americanus* from Minnesota. These groups remained geographically separated until, as part of the FWS recovery efforts, bears from the TRB were brought to the TRC, which is significantly closer geographically to the UARB.  FWS did this for the specific purpose of encouraging interbreeding between the TRC bears and UARB bears in order to increase population size and to hopefully connect the TRB, TRC, and UARB populations.

93.     However, this actually threatens the Louisiana black bear more than it helps it because the non-native bears in the UARB will dilute the native genome of the Louisiana black bear (*luteolus*).

94.     Such hybridization is ignored by the final rule because FWS assumes that the UARB bears are Louisiana black bears, regardless of the genetic analysis results and

historical evidence to the contrary.  Genetic analysis by Laufenberg and Clark shows that

interbreeding of the TRB and UARB populations is already proceeding by way of the TRC.

95.     The final delisting rule claims that Louisiana black bears may have been

hybridized at the time of listing and that this was not a significant cause for concern.

However, this assertion runs counter to the Agency's own analysis, primarily through

Laufenberg and Clark's study, which shows that the threat of hybridization for the Louisiana

black bear is directly caused by the introduction of *americanus,* and that there was no

significant interbreeding between the various Louisiana populations prior to translocations to

the TRC.

96.     FWS contradictorily claims on the one hand that potential hybridization is not a

cause for concern because there was already hybridization at the time of listing, and on the

other hand that the Louisiana black bear was listed because it is a distinct subspecies of black

bears and its unique genetics should be preserved.

97.     The Louisiana black bear was delisted on the basis of recovery – *i.e.* that the

particular subspecies had recovered; not on the basis of extinction, *i.e.* that the species no

longer existed due to hybridization.  Nor was it delisted based on a purported error in the data

supporting the original listing, such that there never was a distinct subspecies of Louisiana

black bears, and thus there is not a need to protect it.  Therefore, in order to delist the bear,

FWS must demonstrate that the *luteolus* subspecies has recovered and is no longer in danger

of extinction, whether from hybridization or other factors.

98.     FWS also did not adequately take into consideration current and future habitat

loss due to climate change. The delisting erroneously concludes that due to their

"adaptability, mobility, and demonstrated resiliency … we conclude that the effects of

climate change are not a threat to the Louisiana black bear now or within the foreseeable future."

99.     As evidence for their adaptability, FWS tells of the 2011 Morganza floodway operation, where 60% of the UARB breeding habitat was covered in floodwaters. FWS claims that approximately 90% of the bears relocated to the 40% of the habitat that was not flooded, while the remainder fled. Ultimately, "most" of the bears returned. However, other scientific studies, including Laufenberg and Clark, have found that repeated flooding of the Morganza Spillway could negatively affect the bears.  Their study also states that flooded wetlands are not used by bears.

100.     Given that climate change is rapidly changing the landscape, particularly in low-lying areas like Louisiana, FWS must take into account the impacts of climate change on the continued existence of the Louisiana black bear.

101.     FWS has violated the ESA and the APA by drawing conclusions about the factors for delisting without using the best available science, and that are arbitrary and capricious, an abuse of discretion, and not in accordance with law. The challenged decision should therefore be set aside pursuant to the ESA and APA. 16 U.S.C. § 1533; 5 U.S.C. § 706(2).

## II.  Second Claim for Relief – Failure to Substantiate that the Louisiana Black Bear is Recovered

102.     Plaintiffs hereby re-allege and incorporate all previous paragraphs of this complaint.

103.     Because the delisting here had recovery as its basis, in addition to considering the five delisting factors, FWS must "substantiate" that the species has recovered, and may delist only if the "best scientific and commercial data available indicate that it is no longer

endangered or threatened." 50 C.F.R. 424.11(d)(2). Thus, FWS must look at factors like population size and population trends, and the stability of habitat quality and quantity.

104.   The FWS delisting did not rely on the best available scientific data, which in fact indicates that population and habitat size and trends do not indicate recovery or that the species is no longer threatened or endangered.

A.   **FWS Failed to Consider the Low Population Numbers of the Louisiana Black Bear, and Overestimated Population Size**

105.   The population growth of the Louisiana black bear does not represent recovery, and the delisting of the bear fails to consider the critical status of the LARB population.

106.   The total estimated population level for the Louisiana black bear was around 700 individuals (including the non-*luteolus* UARB population) in an area of 2,823 square miles at the time the final rule was promulgated. This density is well below that of many other comparable black bear populations in places such as Alaska, the northwestern United States, Minnesota, Great Smoky Mountains National Park, and the Great Dismal Swamp.

107.   The population size of Louisiana black bears was overestimated by inclusion of the non-*luteolus* UARB population, and by relying on the interchange between the TRB and UARB populations by way of the TRC as evidence of the security of those populations. Therefore, the population size, and indeed the number of populations, of Louisiana black bears was overestimated to support the claim that recovery has been achieved.

108.   FWS used its population statistics incorrectly in such a way to suggest stronger population recovery, and that the secure corridor supposedly established between the TRB, TRC, and the UARB is a connection between two *luteolus* populations (which it is not).

109.   FWS considered the Louisiana black bear recovered despite essentially writing off the LARB population, the second largest existing population of Louisiana black bears, whose

long-term viability it could not predict, and which is subject to threats from climate change, development, and human-caused mortality.  FWS's claim of recovery rests solely upon the TRB population, the UARB population (which is non-*luteolus*), and the TRC population, the numbers of which it could not even estimate at the time of delisting.

110.    Even assuming FWS's population numbers are correct, recovery is claimed despite the fact that the subspecies has reached less than one percent of its original numbers (700 compared with 80,000).

111.    FWS asserted that the current population was sufficient to meet the goals of the recovery plan.

112.    However, as acknowledged in the delisting rule, "recovery plans are not regulatory documents." Thus, even assuming the goal of the recovery plan had been met, that would not mean the species was actually recovered in accordance with the meaning of that term in the ESA.

113.    For the delisting rule to claim that an entire subspecies has recovered, when it has reached less than one percent of its original numbers, and to argue that historical population status is irrelevant to recovery, is without scientific basis and is arbitrary and capricious.

**B.  <u>Recovery is Improperly Claimed without Regard to Historic Range</u>**

114.    In considering whether a species is recovered, FWS must consider whether the loss of its historical range undermines the viability of the species as it exists today.  FWS's delisting decision fails to conduct this essential review.

115.    The Louisiana black bear currently occupies only approximately two percent of its historic range (2,823 square miles versus 120,000 square miles).

116.    Instead of considering the loss of historic range in determining whether the species is viable today, in the delisting decision, FWS only considered this topic in the context of the review of the "status of the species" throughout "all or a significant portion of its range." 16 U.S.C. § 1533(c)(2).

117.    FWS claims in the delisting rule that the consideration of whether the Louisiana black bear is still threatened in "a significant portion of its range" only requires that it look at whether the Louisiana black bears in any portion of the *now-existing* range are threatened more than in other areas and still need protection. If so, FWS admits, it would necessitate retaining threatened status for the entire subspecies.  FWS claims that there are not such significant portions of the range where the Louisiana black bear is still threatened, and thus the entire subspecies can be delisted.

118.    FWS has no data supporting a conclusion that the LARB population is viable, and has improperly discounted the ongoing threats to the LARB population.  Therefore, its conclusion that there are no significant portions of the bear's range that are threatened is not supported by the best available science or the evidence relied on by FWS.

119.     The analysis of threats to areas of the existing range does not obviate the necessity of an analysis of how the dramatic reduction in historic range still impacts the status of the species.

120.    The Louisiana black bear originally was listed at least in part because of severe "curtailment of its habitat or range."  FWS stated that the "bear meets the criteria for protection under the Act on the basis of past habitat loss alone."  FWS has not shown that this is no longer the case.

121.     At least parts of the 98 percent of the historic range that is still not occupied (including the vast Texas portion) would need to be considered in a delisting decision that relies on the best available science and considers the appropriate relevant factors.  That has not been done here.

### C.     FWS Improperly Relies on "Peer Review" to Support its Conclusion of Recovery

122.     The delisting rule indicates that the final decision to delist was made in accordance with an FWS "peer review policy," and that three "independent" peer reviewers all "supported our conclusions."

123.     However, the reviewers were not truly independent or disinterested. Two of them are employed by state agencies that deal with wildlife, and one of those is with the Florida Fish and Wildlife Conservation Commission. There recently has been extensive controversy regarding whether the Florida black bear, like the Louisiana black bear, should be fully protected as a threatened species or open to hunting.  A petition to add the Florida black bear to the U.S. List of Endangered and Threatened Wildlife was recently submitted.

124.     The third peer reviewer is employed by a federal agency, the U.S. Geological Survey, which not long ago assumed FWS research functions, and thus cannot be said to be "independent."

125.     FWS has not shown that the reviewers actually supported the conclusion that true recovery of subspecies *luteolus* had occurred, or simply supported the FWS contention that recovery plan criteria had been met.

126.     FWS also has not shown that the reviewers were even familiar with the information showing that the UARB population is not the subspecies *luteolu*s.

127.     In sum, the delisting decision violates the ESA because it fails to demonstrate that the delisting factors have been met, fails to substantiate that the species is recovered, and fails to rely on the best available scientific data.  It also violates the APA because it is arbitrary and capricious, an abuse of discretion, and not in accordance with law. The challenged decision should therefore be set aside pursuant to the ESA and APA. 16 U.S.C. § 1533; 5 U.S.C. § 706(2).

### III. Third Claim for Relief – the Delisting Decision is Arbitrary and Capricious

128.     Plaintiffs hereby re-allege and incorporate all previous paragraphs of this complaint.

129.     The question of whether *luteolus* is a valid subspecies was mentioned in the proposed delisting rule, but was not presented as a reason for delisting.  The delisting proposal was based only on "recovery."

130.     The final delisting rule, though also based on recovery, twice suggests taxonomy as a factor being considered in the delisting.  Specifically, research work is introduced and used to provide purported evidence that *luteolus* may have disappeared through hybridization and/or that it may never have been valid.  The justification that *luteolus* is not a valid subspecies is more akin to claiming error in the original listing (assuming that *luteolus* was already hybridized at the time of listing) or extinction (assuming that *luteolus* was hybridized after listing), than it is to the stated basis for the delisting, which is recovery. Yet, the final rule does not claim error or extinction as a basis for delisting, but only recovery.

131.     The delisting rule uses these and other statements regarding hybridization to discount comments on the proposal that raised concerns about hybridization as an ongoing threat to the subspecies.  The delisting rule appears to take the contradictory position that

hybridization already has occurred but that it is not a threat.  FWS has in fact exacerbated hybridization through its own actions in translocating *luteolus* bears to the TRC to facilitate interbreeding with the non-*luteolus* UARB bears.  The FWS statements on hybridization are inconsistent with FWS conclusions in both the listing and delisting decisions that *luteolus* is a valid subspecies and the conclusion in the delisting decision that it has recovered.

132.    The delisting rule also attempted to equate hybridization between the native TRB bears and the alien UARB bears with interbreeding of the TRB bears and bears moving down from the Dale Bumpers White River National Wildlife Refuge in southeastern Arkansas.  In fact, the latter process is normal interaction between naturally neighboring populations that have been in contact since prehistory, perhaps for many thousands of years.  That is quite different from the entirely human-induced cross-breeding of animals that were widely separated, geographically and ecologically, until recent decades.  However, FWS has interfered even with the natural interaction of the White River and TRB bears, thereby risking modification of the latter's native genome, by supporting translocation of a large number of bears from White River to an area close to the northeastern Louisiana border.

133.    Therefore, FWS has not shown that the *luteolus* subspecies is not under continuing threat from hybridization.

134.    These inconsistent claims render the delisting decision illogical and arbitrary and capricious, in violation of the APA.

IV.    **Fourth Claim for Relief – The Determination to Delist was made for Impermissible Reasons**

135.    Plaintiffs hereby re-allege and incorporate all previous paragraphs of this complaint.

136.    FWS considered impermissible, non-scientific factors in its decision to delist. FWS rushed to propose delisting only a year after its five-year review had concluded that continued listing as threatened was warranted, without explaining how and why its views had changed so suddenly, or why it did not follow the usual course of awaiting the next five-year review to reconsider the status of the subspecies. Moreover, FWS prioritized this delisting over the listings of other highly imperiled species.  These circumstances indicate the likelihood of impermissible, non-scientific reasons for delisting.

## RELIEF REQUESTED

THEREFORE, plaintiffs request that this Court:

1.    Declare that defendants violated the ESA and implementing regulations, and the APA, by delisting the Louisiana black bear and removing its critical habitat designation;

2.    Vacate and set aside the defendants' March 2016 delisting decision;

3.    Award plaintiffs their costs, expenses, and attorneys' fees pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(4) or under the Equal Access to Justice Act, 28 U.S.C. §2412(d); and

4.    Grant such other relief as the Court deems appropriate.

Respectfully submitted this 28th day of June 2018.

       /s/ *Paula Dinerstein*
Paula Dinerstein
D.C. Bar No. 333971
Peter Jenkins
D.C. Bar No. 477229
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring MD  20910
Phone: 202-265-7337
Email  pdinerstein@peer.org
          pjenkin@peer.org
*Attorneys for Plaintiffs*