IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
\

| | | |
|---|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DAVID BERNHARDT, in his official capacity as Secretary, U.S. Department of Interior, et al. | ) ) ) | Case No. 1:18-cv-1547-JCB |
| Defendants; | ) ) ) | |
| and | ) ) | |
| SAFARI CLUB INTERNATIONAL, | ) ) | |
| Intervenor-Defendants. | ) ) | |

**OPPOSITION TO DEFENDANTS' AND SAFARI CLUB INTERNATIONAL'S
MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

ARGUMENT ............................................................................................................. 5

   I.    THE FWS CONCLUSION THAT THE UARB POPULATION IS *LUTEOLUS* IS UNSUPPORTED BY THE RECORD AND IS ARBITRARY AND CAPRICIOUS ............. 5

   II.     LUTEOLUS IS THE SUBSPECIES THAT MUST BE RECOVERED...................... 12

   III.    THE FWS HAS IMPROPERLY MINIMIZED THE LBB HYBRIDIZATION THREAT........................................................................................................... 18

   IV.    REPLY TO SAFARI CLUB'S ARGUMENTS ABOUT THE UARB POPULATION AND HYBRIDIZATION ............................................................ 21

   V.    THE FWS'S FAILURE TO CONSIDER LOSS OF HISTORIC RANGE AND POPULATION INVALIDATES ITS DELISTING DECISION ............................................. 24

      A.   Historic Range ....................................................................................... 24

      B.   Historic Population ................................................................................. 27

   VI.    THE FWS'S SPR ANALYSIS FOR THE LARB POPULATION IS UNREASONABLE ...................................................................................... 28

   VII.   EXISTING REGULATORY MECHANISMS ARE INADEQUATE TO ADDRESS THREATS TO THE LBB......................................................... 36

      A.   Plaintiffs Presented Evidence of Harm from Removal of Federal Habitat Protections 37

      B.   State Management Plans for the LBB Are Inadequate................................. 38

      C.   Existing Regulatory Mechanisms Are Inadequate in Light of Remaining Threats to the LBB and its Habitat.................................................................... 39

   VIII.   PLAINTIFFS HAVE DEMONSTRATED THEIR STANDING TO CHALLENGE THE DELISTING OF THE LBB ............................................................. 40

A.      Plaintiffs Have Shown Injury in Fact to a Cognizable Interest .................................. 44

B.      Plaintiffs' Have Shown Injury in a Personal and Individual Way ............................ 47

C.      Plaintiffs' Injuries Are Fairly Traceable to the FWS's Delisting Determination, and Redressable by a Favorable Decision from this Court......................................................... 49

D.      Organizational Plaintiffs Have Also Met the Elements to Establish Standing........... 50

CONCLUSION AND REMEDY ................................................................................................ 51

# TABLE OF AUTHORITIES

## Cases

*Alaska Oil & Gas Ass'n v. Pritzer,* 2014 WL 3726121 (D. Alaska 2014) ................................. 47

*Am. Wildlands v. Norton*, 193 F. Supp. 2d 244 (D.D.C. 2002) ..................................... 17

*American Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001).................................. 51

*Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426 (D.C. Cir. 1998)............. 44, 47, 49

*Atchafalaya Basinkeeper, et al. v. U.S. Army Corps of Eng'rs,* No. 3:18-cv-23-SDD-EWD (M.D.
 La. 2018) .................................................................................................. 37

*Bennett v. Spear,* 520 U.S. 154 (1997) ...................................................... 49

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir., 2017)............................... 44

*Center for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946 (D. Ariz. 2017)......................... 34

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ..................................... 51

*Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008).............................. 50

*Defenders of Wildlife v. Jewell,* 176 F. Supp. 3d 975 (2016) ...................................... 36

*Desert Survivors v. U.S. Dept. of the Interior,* 336 F. Supp. 3d 1131 (N.D. Cal. 2018) ........ 34, 35

*Friends of Blackwater v. Salazar,* 691 F.3d 428 (D.C. Cir. 2012) ............................... 36

*Gulf Power Co. v. FERC*, 983 F.2d 1095 (D.C. Cir. 1993) ........................................ 13

*Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995).................................... 45

*Humane Soc'y of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017)............. 24, 26, 27, 52

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ..................................... 50

*Hydro Resources, Inc. v. EPA*, 562 F.3d 1249 (10th Cir. 2009).................................... 44

*Louisiana Crawfish Producers Association-West, et al. v. U.S. Army Corps of Eng'rs,* No. 6:11-
 cv-00461-FRD-PJH (W.D. La. 2011) .................................................................. 37

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) ............................... 40, 43, 45

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ............................................ 47

*Meese v. Keene*, 481 U.S. 465 (1987)................................................................ 50

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)............ 5, 18, 21

*NRDC v. EPA*, 755 F.3d 1010 (D.C. Cir. 2014) .......................................... 50

*Otter v. Salazar*, Case No. 1:11-cv-00358-CWD (D. Idaho Aug. 8, 2012).................................. 44

*Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5 (D.D.C. 2011) ........................................................................................................ 40, 47, 49, 50

*San Luis & Delta-Mendota Water Auth. v. Locke,* 776 F.3d 971 (9th Cir. 2014) ....................... 33

*Shays v. Fed. Election Comm'n,* 414 F.3d 76 (D.C. Cir. 2005) .................................................... 49

*Sierra Club v. Morton,* 405 U.S. 727 (1972) .............................................................................. 44

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ........................................................................ 42

*Town of Barnstable v. F.A.A.*, 659 F.3d 28 (D.C. Cir. 2011) ....................................................... 40

*United States Sugar Corporation v. EPA*, 830 F.3d 579 (D.C. Cir. 2016) ................................... 13

*WildEarth Guardians v. Salazar,* 741 F. Supp. 2d 89 (D.D.C. 2010) ......................................... 33

*Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224 (10th Cir. 2000) ........................... 23, 24

## Statutes

16 U. S. C. § 1531 .................................................................................................................. 42, 49

16 U.S.C. § 1532 ......................................................................................................................... 13

16 U.S.C. § 1533 ......................................................................................................................... 42

16 U.S.C. § 1536 ......................................................................................................................... 49

16 U.S.C. § 1538 ......................................................................................................................... 42

16 U.S.C. § 1539 ......................................................................................................................... 42

5 U.S.C. § 706 .......................................................................................................................... 4, 51

## Regulations

"Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the Endangered Species Act's Definitions of 'Endangered Species' and 'Threatened Species'" ("Range Policy"), 79 Fed. Reg. 37,584 (July 1, 2014) .................................................................. 26, 35

50 C.F.R. § 424.11 .............................................................................................................. 6, 14, 22

## INTRODUCTION AND SUMMARY OF ARGUMENT

In their Opposition Brief, the Federal Defendants (hereinafter collectively referred to as the "FWS" for the U.S. Fish and Wildlife Service, the primary agency that took the action at issue here) concur that the case involves the animal subspecies *Ursus americanus luteolus*, the Louisiana black bear (LBB or *luteolus*), and that its removal (delisting) from the list of U.S. List of Endangered and Threatened Wildlife was predicated on the claimed recovery of that subspecies. ECF No. 28, at 1, 4, 7, 9.  Thus, the FWS's claims in this case rise or fall on whether the subspecies *luteolus* has recovered.  Specifically, because the FWS bases its claim of recovery on the asserted viability and connectedness of the Tensas River Basin (TRB) and Upper Atchafalaya River Basin (UARB) populations, it cannot prevail unless both of those populations are in fact *luteolus* – the subspecies that was listed and delisted.  However, the UARB population is not native *luteolus* but the descendant of another subspecies introduced from Minnesota in the 1960s.

The FWS originally listed the LBB subspecies on January 7, 1992, and indicated it once had occurred in eastern Texas, Louisiana, and part of Mississippi, but had been extirpated except in Louisiana. AR 63; 002210-002217.  At the time of listing there were three populations[1] of

---

[1] The FWS designates those and other groups of bears in the region "subpopulations," perhaps reflecting the agency's position that the groups are regularly intermixing components of a larger entity.  We prefer the term "populations," because, as will be shown, all available evidence indicates that, at least in Louisiana at the time of listing, the groups were genetically distinct and geographically isolated from one another.  Laufenberg and Clark (2014), the study on which the FWS delisting most relied, used the designations "subpopulations" and "populations" interchangeably.  AR 362; 016070-016182.  The follow up genetics study (Murphy et al. 2018), which was coauthored by Laufenberg and Clark, used only "populations."  Supp. AR 644 020146-020158.

free-living black bears in Louisiana:  TRB, UARB, and Lower Atchafalaya River Basin (LARB).
*See* Plaintiff's Opening Brief, map at 10.

The FWS's Recovery Plan for the LBB set three basic recovery criteria:

*(1)      At least two viable subpopulations, one each in the Tensas and Atchafalaya
River Basins;*

*(2)      Establishment of immigration and emigration corridors between the two
subpopulations;*

*(3)      Protection of the habitat and interconnecting corridors that support each
of the two viable subpopulations used as justification for delisting.*

AR 79; 002600.

The FWS position that these criteria have been met rests on its claim of two viable and
connected populations – namely the UARB and the TRB.  The connectivity came through
translocating native Louisiana black bears, mostly from the TRB, to an area between the TRB
and the UARB, known as the Three Rivers Complex (TRC), where those bears have interbred
with bears from the UARB and established a new, though not yet viable, population.  Thus, the
claim of recovery supporting delisting is entirely dependent on both the UARB and TRB
populations being the listed and purportedly recovered subspecies, *luteolus*.  However, the
UARB population is not part of that subspecies, rather it is descended from Minnesota bears of
another subspecies, *Ursus americanus americanus* ("*americanus*"), which had been captured in
Minnesota and introduced to the UARB in 1964–1967.

Nonetheless, the FWS claims that the UARB population qualifies as *luteolus*, despite its
origin in bears of the *americanus* subspecies, because: (a) it could not conclude that the UARB
bear population was "exclusively" descended from the Minnesota introduction, (b) the possibility
existed that one or a few native *luteolus* bears might have interbred with the introduced
*americanus* bears, resulting somehow in the entire UARB population being converted into

*luteolus,* and (c) the UARB and current day Minnesota populations are "genetically distinguished from each other."

The FWS's arguments are contradicted by the genetics research of scientists who provided what the agency has termed the "best available science" on the issue.  As Plaintiffs elucidate below, that research confirms that the UARB population is descended from the introduced *americanus* bears from Minnesota, and that the only substantive intermixing between that population and any true *luteolus* populations is the beginning of interchange through the TRC population, recently established by the FWS for the very purpose of causing such interchange.  The genetic divergence of the UARB population from current-day Minnesota bears is <u>away</u> from the *luteolus* populations and thus evidences genetic drift due to isolation over time rather than interbreeding.  Further, the FWS argument also defies all logic: the existence of one or two highly speculative past breeding events could not have converted a population of *americanus* bears into a different subspecies as the agency asserts.

While claiming that the UARB population, as well as the other Louisiana bear populations are *luteolus,* the FWS also makes the inconsistent claim that all of the populations were already hybridized at the time of listing and are possibly indistinguishable from *americanus.*  The FWS argues that this somehow means that hybridization is not a concern, and that, by implication, there is no problem with a claim of recovery based on agency-created breeding between the *americanus* UARB population and the long-standing *luteolus* TRB population.  This effort to dispense with the Plaintiffs' concerns about hybridization, however, contradicts the entire basis for listing the *luteolus* subspecies to preserve its "unique genetic

3

material,"[2] as well as the finding that the *luteolus* subspecies had recovered and therefore could be delisted.

In addition, the FWS failed to engage in the required analysis of the effects on the subspecies today of the loss of the LBB's historic range and population, even though the original listing was based primarily on the loss of habitat and the LBB currently occupies only a tiny percentage of its historic range and its population is also a tiny fraction of its historic numbers.

The FWS has minimized the threat of hybridization, especially from its own actions in creating the TRC, and which threat alone requires that the LBB remain listed. There is not adequate logical or evidentiary support for the agency's finding that the Record lacks substantial information to indicate that the LARB population may be threatened or occupying a significant portion of the LBB range. The FWS and the Safari Club have also failed to demonstrate that existing regulatory mechanisms are adequate to protect the LBB. Finally, Safari Club's challenge does not undermine Plaintiff's standing.

The issue of deference to the agency is critical; but there is a reasonable limit. The FWS may choose between conflicting scientific authorities, but it may not patently misrepresent the very authorities it relies on. Nor may it advance inconsistent and illogical claims. The FWS is asking for deference to arbitrary, capricious and unscientific claims, which neither the APA nor case law requires.[3] As the Supreme Court held, an agency's action is arbitrary and capricious if

---

[2] According to the delisting rule, "the only practical means available for protecting **any possibly remaining unique genetic material** originally belonging to the native *U. a. luteolus* would be through listing and protecting the taxon ...." AR 63; 002214 (emphasis added)." AR 654; 020072.

[3] Under the APA, 5 U.S.C. § 706(2)(A) (in pertinent part):
      *The reviewing court shall—*

it "has…. entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Here, in addition to other failures identified, the FWS has most notably failed to plausibly explain its decision to recover the ESA-listed LBB subspecies through reliance on non-native UARB bears of a different, non-listed, subspecies.

## ARGUMENT

I. **THE FWS CONCLUSION THAT THE UARB POPULATION IS *LUTEOLUS* IS UNSUPPORTED BY THE RECORD AND IS ARBITRARY AND CAPRICIOUS**

The FWS claim that the UARB population is *luteolus* is pivotal to its claim that its Recovery Plan criteria have been met because there are two viable and connected populations of LBB.  But the claim is unsupported by the very scientific authorities that the FWS relies on, and is arbitrary and capricious.

The FWS position is fatally undermined by this key concession in its Opposition (at 18):

"**The 2014 [Laufenberg and Clark] study found a genetic affinity between the Minnesota *U. a. americanus* and the UARB subpopulation as Plaintiffs contend**…."  Beyond that basic concession, which admits the agency analyzed the status of the LBB and claimed to have

---

*(2) hold unlawful and set aside agency action, findings, and conclusions found to be—*
*(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.*

achieved its Recovery Plan criteria by designating UARB bears of *americanus* descent as

*luteolus*, the rest of the FWS Opposition's arguments amount to nothing but obfuscation.

 Contradicting the admission just quoted, which relied on the Laufenberg and Clark study

that the FWS described as "the best available science," AR 654; 020067, the FWS Opposition (at

19) then seeks to prove its assertion that the UARB population is not the Minnesota *americanus*

subspecies.  This is contrary to the genetic findings of Laufenberg and Clark (2014) and others.

To try to justify including the UARB population as somehow being *luteolus,* the agency embarks

on biological frolic that begins with claiming that "it could not conclude that the UARB was

'bear free' at the time of the Minnesota introduction." Opposition at 20. The Opposition cites to a

claimed observation of **one** "untagged bear in the UARB"[4] as its evidence in support of the idea

that that whole population could have become, by 2016, a hybrid *luteolus* x *americanus* mix

properly classifiable as *luteolus*.[5] *Id.* at 19.

 A review of some basic biological facts will show the FWS is grasping at genetic straws

with that argument rather than meeting the "*must be supported by the best scientific and*

---

[4] The Minnesota bears were tagged when they were brought to the UARB in the 1960s.

[5] It is disturbing that the FWS grasps this very slim evidence of possible slight genetic influence of *luteolus* in the UARB, since when it assembled the Administrative Record (AR) for this case the agency ignored a large amount of evidence that the UARB population consisted of Minnesota bears.  The FWS omissions compelled Plaintiffs to file a Motion to Complete and Supplement the Administrative Record, which they fully briefed and supported with the Expert Declaration of Ronald M. Nowak Identifying Documents in Support of Plaintiffs' Motion, with lengthy accompanying documents. ECF No. 14. Ultimately, rather than deny that evidence, the FWS conceded that all five documents showing, *inter alia*, the Minnesota character of the UARB population, should have been in the AR.  It claimed without explanation that they had been "inadvertently excluded".  Defendants' Response to Plaintiffs' Motion to Complete and Supplement the Administrative Record and Notice of Filing the Certified List of the Contents of the Supplemental Administrative Record.  ECF No. 21.  They now are in the Supp. AR Nos. 640 through 644, Bates Nos. 020098- 020158.  ECF No. 21-2.

*commercial data available"* standard that the ESA's delisting regulations require, 50 C.F.R. § 424.11(d):

- No bear population had been in the UARB for several decades before the introductions from Minnesota. According to St. Amant (1959), AR 11; 000672-000679, an official publication of the Louisiana Wildlife and Fisheries Commission (LWFC) and the most comprehensive source on the historical status of the LBB, the original native population of the UARB was extirpated between the 1890s and 1950s.  In the final delisting rule the FWS agreed, stating "…. we believe it is very likely there was no known breeding population in that area at the time of the releases." AR 654; 020073 and 020091.

- That history is supported by various sources, including Laufenberg and Clark who state: "By the late 1950s, the number of black bears in Louisiana was reduced to only 80–120 individuals in isolated patches of habitat in the LARB and TRB." AR 362; 016160.  That study, which reiterated the absence of a prior UARB population, was the source the FWS cited most extensively in developing its delisting decision (cited 114 times in the Proposed Rule, AR 548, and 140 times in the Final Rule, AR 654). In the Final Rule, the FWS termed it "… the best available science ... and ... the currently most advanced or sophisticated analyses for the Louisiana black bear".  AR 654; 020067-69.

- The population residing in the UARB at the time of the LBB's 1992 listing -- and still there -- originated in 1964 to 1967, when 130 to 132 *americanus* bears, captured about 1,000 miles away in Minnesota, were released.

- Although many of the introduced bears quickly left the UARB and/or were killed, some remained, resulting in a permanent, reproducing population, which was

the subject of a field study from 1970 to 1971. Brunett et al. (1975) Supp. AR 640; 020098-020102; Lowery (1974), cited in a public comment in AR 492; 018663-018687; Nowak (1986) AR 37; 001832-001848; and Taylor (1971) AR 12; 000680-000776.

Remarkably, the Proposed Rule failed to substantively address whether the UARB population was in fact descended from the Minnesota introduction.  The FWS gave little attention to the issue until far into the proposal under "Summary of Factors Affecting the Species." AR 548; 019225.  Even then, no real consideration was given to the possibility that the UARB population was, and is, not predominantly *luteolus*.

The final delisting decision does address the concern raised by commenters that the UARB population does not consist of LBB, and in response disagreed that "the UARB subpopulation consists primarily of entirely of Minnesota bears."  AR 654; 020072.  However, the FWS Opposition goes further, at 20, fn 5, and adds the *post-hoc* rationalization that "the [Laufenberg and Clark] 2014 study supported the Service's belief that the UARB contained a hybrid of *U. a. luteolus* and *U. a. americanus*."

This statement is not only *post hoc* rationalization; it also misrepresents the findings of the Laufenberg and Clark study.  Nowhere do Laufenberg and Clark, AR 362; 016070-016182, say "that the UARB contained a hybrid of *U. a. luteolus* and *U. a. americanus*."  Indeed, the words "hybrid" and "hybridization" do not appear in the text of their report.[6]  With regard to

---

[6] The FWS Opposition, at 11, para. 3, refers to a claim in the final delisting rule, AR 654; 020091, that Laufenberg and Clark (2014) "...supports the Service's assumption that the whole Louisiana black bear **metapopulation** is hybridized to some extent." (emphasis added).  The delisting rule defines "metapopulation" as the combined TRB, TRC, and UARB populations. AR 654; 020051.  With respect to that assumed metapopulation, the FWS Opposition is correct because there is indeed hybridization.  It was confirmed by Laufenberg and Clark, especially by their statistical analysis represented in figure 16a. AR 362; 016130.  However, that hybridization has resulted not from the Minnesota introductions in 1964-1967, but rather from the FWS's later

Laufenberg and Clark's assessment of the identity of the UARB population, their two most relevant quotations appear to be these:

     1.     "No evidence was found of interchange from any of the subpopulations to the … UARB …."  This is from the Abstract, AR 362; 016079, as well as the Summary and Conclusions, at 016170.  It indicates there was no evident genetic influence from nor hybridization with any other Louisiana bears in the UARB.  Hence, the UARB population was only associated with the bears introduced from Minnesota.

     2.     "When all populations were included in the analysis …. genetic structure appeared to be … lowest between MINN and UARB." AR 362; 016127.  This indicates that when the current bear population in Minnesota ("MINN") and all of Louisiana's bear populations were compared genetically, the two with the **least** difference were those of Minnesota and the UARB.

Again, nowhere in any other document in the Administrative Record is there any evidence that, at the time of the Minnesota introduction in the 1960s, there was any LBB bear population in the UARB or that there were any bears there that could have been affected by the introduction, and the current genetic evidence confirms this fact.

Scientists who study bears would accept the possibility that an occasional young *luteolus* male dispersing from the TRB or LARB <u>might</u> have reached the UARB's *americanus* population after the Minnesota introductions, <u>might</u> not have been killed or driven off by resident males, and <u>might</u> have mated with a female there.  But, that would be speculation unsupported by any reliable field or genetic evidence.  Even <u>if</u> such mating occurred and <u>if</u> it produced viable

_____

misguided introductions of *luteolus* bears from the TRB into the TRC in 2001-2009, which placed them in a proximate location to hybridize with the *americanus* bears in the UARB.

9

offspring, the result would have been only a very minor genetic infusion into the overall UARB population and it would not be proper to regard such an infusion as a conversion of that population into native *luteolus* for purposes of an ESA delisting.  It would be like saying that if a man from France goes to Russia, marries a woman there and has a child with her, the whole Russian population becomes French.[7]

The Service's rationale that the UARB population could be considered *luteolus* for purposes of the Recovery Plan criteria simply because it may not have been "*exclusively*

---

[7] The FWS speculation about a possible mating between UARB *americanus* and TRB or LARB *luteolus* and resulting hybrid offspring rests on shaky ground.  Consider the one piece of supporting field evidence offered by the Opposition (at 19), referring to the final delisting rule "citing an observation of an untagged bear in the UARB after the introduction of tagged Minnesota bears, and the well-documented male bear behavior of traveling wide ranges."  The rule, AR 654; 020073, specifically had referred to an animal seen by Taylor (1971), AR 12; 000754, during his 1970–1971 field study in the UARB, when he captured six bears, four known by ear tags to be from the Minnesota introduction, one known to be a cub of an introduced female, and one "in all probability an offspring of one of the original releases" (that assessment is from George H. Lowery, Jr., a renowned zoologist at Louisiana State University, along with Taylor, on page 408 of his book *The Mammals of Louisiana and Its Adjacent Waters*, published by the LSU Press in 1974 for the Louisiana Wild Life and Fisheries Commission and cited in a public comment, AR 492; 018672, on the proposal).  The final rule confused the last of those six bears with the unmarked animal seen by Taylor, which was actually a seventh bear that was never captured but was merely observed on a few occasions from unstated distances and once from 100 yards.  AR 12; 000722, 000754. The FWS Opposition (at 19) implies this may not have been a Minnesota bear or the offspring thereof.  That admittedly is within the realm of possibility but is less likely than the alternative.  This seventh bear was seen in October 1970.  That was six years after the first introductions in 1964 and over five years after introduced females could have first given birth in Louisiana.  There thus was sufficient time for an unmarked individual to be born and grow to large size.  In addition, just because no markings could be seen on this bear in 1970 does not mean it had never been marked, as it is well-known among bear biologists that ear tags are frequently lost over time, especially by males.  As for males "traveling wide ranges," Laufenberg and Clark, AR 362; 016079, reported no evidence of interchange from any other population to the UARB, and also found, AR 362; 016168, that prior to the TRC translocations the dispersal potential for females between all of the Louisiana populations was low to non-existent and that, without the TRC bears, there would not even be interchange of males between the UARB and TRB.

descended from the Minnesota bear introduction," Opposition at 19, assumes that the possibility of the slightest genetic transmission from native *luteolus* to the UARB population, perhaps through a single mating, is sufficient to recognize that entire population as *luteolus*, not *americanus*.   However, a drop of intermixed blood does not convert a subspecies designation. There is nothing in the Record to support such a conclusion.

When the agency's legal brief ignores key published science in the Record and relies instead on speculation, it deserves no deference.  Yet, inconclusive anecdotes are exactly what the FWS lawyers pointed to in claiming that the UARB population is a *luteolus x americanus* hybrid that could be considered *luteolus* for purposes of meeting the recovery plan criteria.

As for the Opposition's claim (at 19) that the Laufenberg and Clark study confirmed that the UARB and Minnesota populations can be "genetically distinguished from each other," it is true the study found the two statistically different to some extent, as might be expected because of genetic drift during a half century of isolation.  However, Laufenberg and Clark did <u>not</u> report that the UARB population had ever been genetically influenced in the direction of *luteolus*, as the FWS Opposition implies (at 18).  If anything, the opposite is true.  Laufenberg and Clark referred to their statistical analysis in figure 15, AR 362; 016129, comparing the genetic composition of the TRB, LARB, UARB, and Minnesota populations.  All the groups are strikingly distinct, except that Laufenberg and Clark noted the slight overlap of the UARB and Minnesota groups along axis 1 of the graph "… indicating considerably less genetic structure [distinction] between those two populations than for other population pairs."  AR 362; 016127. A review of figure 15a, *id*., at 016129, where this overlap appears, shows that the UARB individuals along axis 1 are displaced farther away from the native TRB and LARB bears than are the current Minnesota bears.  Rather than being influenced by hybridization or any

interchange with the native groups, the UARB population is shown to be independently diverging from its Minnesota ancestors in the opposite genetic direction and becoming even less like the *luteolus* genotype.

The entire issue has been further clarified by the new intensive genetics study, Murphy et al. (2018). Coauthored by a team of state, federal, and academic authorities, including Laufenberg and Clark, and given logistical support by the FWS, the study found unambiguously that the UARB population "is likely the product of the historical translocated Minnesota bears." Supp. AR 644: 020152. Further, the study found no evidence that the 1960s releases of Minnesota bears had genetically influenced the TRB population of *luteolus* bears. *Id.* That is, no science supports the FWS's repeated assertions either that the UARB population is *luteolus* or that LBB was, or is, on the whole an intraspecific hybrid (see next section). With that clarity, the FWS is "hoist with its own petard".

## II.   LUTEOLUS IS THE SUBSPECIES THAT MUST BE RECOVERED

The FWS attempts to muddy the waters of what is actually a simple question of whether the subspecies that was listed, *luteolus*, has recovered and meets the ESA criteria for delisting. The FWS does so by claiming—contrary to its own listing and delisting of *luteolus*—that *luteolus* was already hybridized at the time of listing, and may not be a subspecies distinguishable from *americanus* at all. Without Record support, the FWS goes on to claim that genetic intermixing among the subspecies is good for the health of *luteolus,* that there is no need to be concerned about hybridization (or about a recovery effort that purposefully encourages hybridization), and that *luteolus* can be delisted.

The FWS appears to be seeking deference to a scientific judgment that it could shift its recovery aims toward conserving the species *americanus* generally in Louisiana rather than achieving *luteolus* recovery. This appears most markedly in its Opposition, at 19, where the

agency gives credence to: "evidence that the three subspecies of bears in the eastern range of black bears represent a single genetic cluster and are best designated *U. americanus.*"  Such a position flatly contradicts the FWS assertion, in claiming that all of its Recovery Plan criteria were met, that the UARB population consists of *luteolus*, and that the Louisiana black bear, *luteolus,* is fully recovered. AR 654; 020069.[8]  The agency's reasoning is so inconsistent that it is on all fours with the classic definition of arbitrary and capricious. The D.C. Circuit reiterated that definition in *United States Sugar Corporation v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016):

> This court has "often declined to affirm an agency decision if there are unexplained inconsistencies in the final rule." See Dist. Hosp. Partners, 786 F.3d at 59; see also *Gulf Power Co. v. FERC*, 983 F.2d 1095, 1101 (D.C. Cir. 1993) ("[W]hen an agency takes inconsistent positions ... it must explain its reasoning."); Gen. Chem. Corp. v. United States, 817 F.2d 844, 846 (D.C. Cir. 1987) (holding agency action to be arbitrary because its analysis was "internally inconsistent and inadequately explained").

---

[8] The FWS stated in the final delisting rule, "although we recognize that there are still questions around the taxonomy, we still consider the Louisiana black bear to be a distinct subspecies described by Hall (1981, pp. 948-951)." AR 654; 020069.  The proposed delisting rule called for public comments, "in particular" concerning such topics as threats to the bear and its habitat. AR 548; 019196-97.  Taxonomy, as well as "listing error" and "extinction," were not identified as topics on which comments were sought.  To then support delisting on the basis of what would amount to a listing error would deny due process to commenting members of the public.  Moreover, the paper (Puckett et al. (2015), AR 554; 019241-019253, cited in the final delisting rule, AR 654; 020073, regarding this taxonomic matter, is not an effective basis for invalidating *luteolus* or making that subspecies part of *U. americanus*.  The study was not primarily concerned with the LBB and other populations of the southeastern United States, such as were the numerous other genetics investigations cited herein.  Puckett et al. provided a continent-wide assessment of the biogeography of black bears, and as such gave little attention to details differentiating local populations and subspecies.  They examined sample material from only two individual bears designated *luteolus*. Figure 1 of the paper, AR 554; 019242, and Table S2 of the Supplementary Information, AR 555; 019259, reveal those two specimens were not from Louisiana but from western Mississippi, where Murphy et al. (2018), Supp. AR 644; 020151, found 63.3 percent of bears to be descended from migrants from the unlisted, non-*luteolus* population in the White River Basin (WRB) of Arkansas.

If it were truly the FWS's biological opinion that all of the black bears in the area were a single cluster of *U. americanus*, then it could not have listed *luteolus* in 1992 because the overall species *U. americanus* was neither threatened nor endangered.  The FWS cannot at this point offer this opinion to, in effect, eliminate the LBB's distinct ESA subspecies status on which both the listing and delisting were based under the guise of scientific judgment.  The ESA definition of a listed "species" includes: "any subspecies of fish or wildlife or plants." 16 U.S.C. § 1532(16).  Having listed "*Ursus americanus luteolus,*" AR 63; 002216, it is too late now to take the position that this subspecies lacks a distinct genetic identity.  Per FWS regulations, if this were the reason for the 2016 delisting, it should have been based on "**error**" in the original 1992 listing, because *luteolus* had already been hybridized out of existence then, or on "**extinction**" because it was hybridized out of existence by 2016.[9]  Instead, the FWS's delisting rule claimed **recovery** of *luteolus* under 50 C.F.R. § 424.11(d)(2), and its decision must stand or fall on that claim.  AR 654; 020069. To do otherwise is a violation of the regulation and the ESA.

In addition to not being an appropriate basis for delisting *luteolus*, the claim that all the black bears in Louisiana are *americanus*, or some sort of hybridized mixture, is also factually unsupported in the Record.  This claim stems primarily from a single unpublished report (Pelton 1989), AR 47; 001959-002034, as cited by the FWS Opposition at pages 16, 17, 18, 20, 22.

---

[9] The applicable regulation is 50 C.F.R. § 424.11(d), which provides (in pertinent part; first emphasis added; second two in original):... *Such removal **must be supported by the best scientific and commercial data available** to the Secretary after conducting a review of the status of the species. A species may be delisted only if such data substantiate that it is neither endangered nor threatened for one or more of the following reasons: (1) **Extinction.** Unless all individuals of the listed species had been previously identified and located, and were later found to be extirpated from their previous range, a sufficient period of time must be allowed before delisting to indicate clearly that the species is extinct…. **(3) Original data for classification in error.** Subsequent investigations may show that the best scientific or commercial data available when the species was listed, or the interpretation of such data, were in error.*

Reliance on this 30-year-old document instead of the modern and definitive genetic studies reveals the arbitrary and capricious basis for that claim.  The FWS also relies on this report for the proposition that genetic intermixing with *americanus* was a benefit that would help the recovery of *luteolus*.[10]

That document comprises a status summation by Pelton and three taxonomic appendices on electrophoretic analysis of tissue, mitochondrial DNA, and cranial morphometrics. According to Pelton, AR 47; 001970-001972, the small and restricted samples of the electrophoretic analysis handicapped determinations, and the DNA study indicated "minimal" genetic difference between *luteolus* and other black bears, but morphometrics did support the taxonomic validity of the subspecies.  Pelton, AR 47; 001976, actually advised against listing in this report and in a subsequent paper, AR 56; 002110.  However, the FWS did list the subspecies in 1992, effectively rejecting Pelton's repeated contention that the subspecies did not merit ESA-protected status.  For the FWS to go back now and rely on this decades-old paper that it rejected in 1992 as to whether the LBB should have been listed under the ESA is utterly inconsistent and capricious.

The Pelton report's assessment of DNA was the basis of the FWS position that, "At that time, the genetic studies did not show significant differences between the subspecies." AR 654; 020072.  This position seems to have prevailed long afterwards and evidently influenced the decision to encourage interbreeding between the TRB and UARB populations by means of the

---

[10] It is odd that the agency bases its argument on this cursory report. While citing Pelton's other papers repeatedly, the FWS did not even cite his 1989 report in its 2015 Proposed Delisting Rule, with respect to taxonomic or hybridization issues, except once when his report was used to actually support the validity of the subspecies *luteolus*, AR 548; 019198.  In the Final Rule in 2016, curiously, that particular reference in support of delisting was dropped and replaced with a citation from the same report suggesting "…that a pure strain of *U. a. luteolus* subspecies no longer existed …." AR 654; 020073.

TRC translocations.  A number of subsequent relevant genetics studies were carried out, mostly

funded by the FWS.  One such study, Triant et al. (2004), AR 145; 004844-004847, at 004844,

specifically warned of the hybridization danger posed by the translocations; nevertheless, the

final rule claimed there was "no definitive determination or conclusion [on taxonomy] that has

been widely accepted." AR 654; 020069.  Thus, at least through the time of the 2001–2009

translocations, the FWS continued to base its actions on the 1989 Pelton report insofar as

rejecting concerns about hybridization.

Only later did the FWS commission the comprehensive study by Laufenberg and Clark

(2014), AR 362, which now has largely discredited the Pelton report's conclusions that *luteolus*

populations were not genetically separable from other subspecies and that there had been wide-

spread dispersal and intermixing of the Louisiana populations.  Again, the follow up genetics

study (Murphy et al. 2018), Supp. AR 644, coauthored by Laufenberg and Clark, found no

genetic signal of dispersal and inter-mixing between the populations in the UARB and the TRB.

Supp. AR 644; 020152.  Also, according to the delisting rule, the probability of interchange

between the UARB or TRB bears with the southernmost LARB population is low. AR 654;

020095.  The Pelton report's assertions that there was extensive intermixing of the small

populations and subspecies, at least in Louisiana, is proven wrong.[11]

---

[11] Based on the Pelton report, AR 47; 001973, the FWS accepted that a "broad continuum of
habitat" connecting the TRB, UARB, and LARB populations may have facilitated "wide-spread
dispersal" between those populations following the Minnesota introductions, resulting in the
hybridization of all Louisiana bears, AR 654; 020073.  However, for this information, Pelton
cited his "Fig. 5, Possible black bear range in Louisiana in the mid-sixties," AR 47; 001965,
which is a crudely drawn map, for which no references are cited other than unpublished and
unspecified information from one person.  Pelton made assumptions about ecological and habitat
conditions at various times but cited no scientific references for those assumptions.  The FWS
may argue that habitat conditions were more conducive to dispersal in the 1960s, when the
Minnesota introductions took place, than in the late 1980s when Pelton's report was written, but

In short, the FWS's reliance on the Pelton paper's conclusions about the lack of a distinct *luteolus* subspecies in support of delisting is akin to arguing that it "had to destroy the subspecies in order to save it." That approach not only violates the ESA, but also contravenes current science. *Luteolus* is not genetically destroyed – yet. Indeed, the relatively pure TRB and LARB *luteolus* populations' numbers were expanding significantly during the 24 years, 1992 to 2016, when their ESA status protected them from take and provided the benefit of designated critical LBB habitat.[12] The independent recovery of those two populations, while certainly not fully achieved and not enough to shed their "threatened" status, was well underway.[13] Nothing in the record besides some informal biologists' opinions supports a conclusion that those *luteolus* populations required genetic intermixing with another subspecies in order to save them.

In sum, it is unreasonable for the FWS to claim that it has recovered the *luteolus* subspecies based largely on conserving and connecting the *luteolus* TRB population to the UARB population which, on the basis of the most current science, consists predominantly of the Minnesota

---

no substantive documentation of such differentiation exists in the AR, and the thesis is proven wrong by the modern genetic studies finding no such genetic intermixing. AR 362; 016079, 016168, 016170; Supp. AR 644; 020152.

[12] During the period of the ESA listing of *luteolus*, the TRB and LARB populations grew at respective annual rates of about 9 percent and 8 percent (data from AR 654; 020053-020059), assuming a 20 year period from the 1992 listing to the time of the work of Laufenberg and Clark, which was published in 2014 but for which data collection was largely complete by 2012. AR 362; 016090. Such increases are reasonable in light of what has been reported for other black bear populations. Sources cited by Murphy et al. (2015), AR 478; 018210-018221, indicate growth rates of 12 to 24 percent are feasible for black bears, given sufficient suitable habitat and protection.

[13] The growth and size of the UARB population can be compared to those of the two native TRB and LARB populations. In the 1980s there were about 35 bears in the UARB; after ESA listing, this *americanus* population increased to a mean estimated size of 69 bears, per AR 654; 020055-56, which indicates an annual growth rate of just 3.6 percent over a 20-year period. Notwithstanding the FWS arguments about their claimed viability and hybrid genetic "health," the UARB bears grew at a much slower rate than did the two *luteolus* populations under ESA protection.

17

subspecies, *americanus*.  In ESA terms, it is equivalent to the agency claiming that it recovered the highly-endangered red wolf (*Canis rufus*) based on conserving, and connecting it to, a population of the non-endangered common coyote (*C. latrans*) nearby. Endangered species recovery does not work that way, biologically or legally. *See e.g., Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 254 (D.D.C. 2002) ("[T]he identification of the potentially viable - or endangered - population is vital to [the] ultimate listing determination.").

### III.   THE FWS HAS IMPROPERLY MINIMIZED THE LBB HYBRIDIZATION THREAT

The FWS Opposition (at 22) makes another highly dubious assertion: "Here, the Service never considered hybridization a threat to the Louisiana black bear….".  It then uses its lack of consideration to justify inclusion of the UARB population as *luteolus* in the delisting analysis.  If taken literally, that claimed lack of consideration would indict the delisting decision, as it means the agency "failed to consider an important aspect of the problem" it was facing in recovering the LBB based on the record before it. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The Record reveals multiple points in which the hybridization "part of the problem" was squarely before the FWS, yet the agency still refused to acknowledge the *americanus* status of the UARB population and dismissed hybridization as a threat, not because of any certainty that it was not a threat, but because of claimed uncertainty.  AR 654; 020073 and 020091.  For example, the Opposition notes (at 7), "The Service determined that disease and predation were not threats to the subspecies and, significantly, was unable to conclude that hybridization with other subspecies was a threat to the subspecies."  This indicates the FWS was quite sure the other factors were not threats but was uncertain about hybridization.

Hybridization was a major concern among agency officials, scientists and the stakeholders involved, e.g.: Supp. AR 641; 020103 (letter to FWS Director from Secretary of

18

Louisiana Department of Wildlife and Fisheries highlighting hybridization concerns.); Supp. AR 642; 020104-020137, at 020105 and 020106 (email exchange among FWS officials stating concern that Csiki et al. (2003), AR 136; 004678-00468, concluded that the UARB bear population "... should not be protected under the ESA because of interbreeding with introduced American black bears from Minnesota," because, quoting from that study: "Our data indicate that some of the federally-protected bear populations of Louisiana are largely derived from translocated bears").

A further indication of the FWS improperly disregarding the hybridization threat is that from 2001 through 2009, without first assessing the genetic identity of the UARB bears, the FWS and state agencies artificially moved animals from the TRB to the TRC, proximate to the UARB, to stimulate interbreeding and connection of the two populations per its Recovery Plan criteria.  AR 654; 020053.  Only later did the FWS commission Laufenberg and Clark's genetic research on all relevant bear populations, whose results documented the hybridization risk of what the FWS et al. had just done.  Their 2014 publication shows the UARB and TRB populations to be of distinct genetic makeup.  The FWS had been wrong to take the position that they were already hybrids, and wrong to carry out the translocation project to purportedly aid in the LBB's recovery.

Indeed, Laufenberg and Clark also show that the hybridization process that was erroneously claimed to have happened earlier is now actually taking place, thanks to the agency's ill-considered introductions.[14]  The very entity charged by the ESA with conserving the

---

[14]  Laufenberg and Clark's figure 16a, AR 362; 016130, strikingly depicts this process.  Here the analysis is restricted to just the TRB and UARB populations, plus the bears of the TRC.  The TRB and UARB populations are statistically distinct and far apart, supporting historical accounts of their subspecific differentiation and widely separate geographical origins.  As would be

unique LBB has instead facilitated its demise, and now with delisting, has washed its hands of the responsibility to correct its wrongs.  The "Teddy Bear" that played an important role in the history, ecology, and culture of a vast portion of the southern United States is now being genetically swamped.

The FWS also attempts to bolster its claim that "the whole Louisiana black bear population is intraspecifically hybridized to some extent" by reference to Laufenberg and Clark's finding of some interchange between the TRB *luteolus* population and the bear population found in the White River Basin (WRB) of Arkansas (about 75 miles north of the northeastern Louisiana border).  Opposition at 18.  The FWS recognizes that the WRB population consists of the subspecies *americanus*. AR 654; 020073 ("Since listing, there have been numerous studies relevant to the subspecies, many focusing on the relationship of the southern Arkansas WRB black bear subpopulation (*U.a. americanus*) to the Louisiana black bear.")  The population played no role in the FWS's claim to have achieved the LBB recovery criteria. The delisting final rule, AR 654; 020073, indicated that the distribution of *luteolus* does not include Arkansas. Hence, the Opposition referred to "intraspecific" hybridization, meaning that which might occur between two subspecies within a species.

However, Laufenberg and Clark's finding of "interchange" does not amount to a finding of "intraspecific hybridization."  We reiterate that the words "hybrid" and "hybridization" do not appear anywhere in the text of Laufenberg and Clark's report, AR 362.  And the report gives no

---

expected, many of the TRC individuals are shown to be genetically the same as those of the TRB population, from which they were taken.  However, there also is a substantial group of bears that are genetically intermediate to the TRB's *luteolus* population and the UARB's *americanus* population.  That intermediate group apparently represents the results of interbreeding between the TRB and UARB populations.

indication that all Louisiana bear populations are intraspecifically hybridized.  What the study (figure 17), AR 362, did do was statistically compare the genetics of two subgroups of the TRB population with the WRB population.  The two TRB subgroups overlapped extensively, but the overall TRB population was mostly distinct from that of the WRB, indicating no substantial intermixing.  A few individuals of the TRB and WRB did overlap, and such affinity could be expected, as the TRB and WRB groups always have been in natural close proximity. Subspecies, unlike full species, normally interbreed with one another where their natural ranges come together. AR 9; 000169, 000191; AR 23; 001095-001096.  It is improper to use the term "hybridization" for such natural and normal blending between neighboring subspecies, and Laufenberg and Clark did not do so.

The FWS has not appropriately interpreted or applied the study, and seems to believe it makes no difference whether the TRB population interbreeds with the WRB population or the UARB population. But in fact there is a substantial difference.  Contact and interbreeding between the TRB and WRB populations, without any manipulation or translocation, represents normal interaction of neighboring subspecies. The artificial transportation of Minnesota bears to the UARB, an area 1,000 miles away, and any resulting unnatural cross-breeding that results, has nothing to do with normal intergradation where the natural ranges of two subspecies adjoin.

An agency decision, as here, that swept this major threat of hybridization of *luteolus* with another non-listed subspecies, *americanus,* under the rug is one that "failed to consider an important aspect of the problem".  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Under the APA, it is not entitled to being upheld.

## IV. REPLY TO SAFARI CLUB'S ARGUMENTS ABOUT THE UARB POPULATION AND HYBRIDIZATION

Intervenor Safari Club International's argument regarding inclusion of *americanus* bears in the *luteolus* delisting decision boils down to the same willingness to violate ESA standards as the FWS evinced by basically saying, in effect: "never mind! - the subspecies didn't really exist". The Safari Club's brief, (ECF No. 25) at 16, is very explicit, claiming "… subspecies designation may not be warranted for Louisiana black bears". It cites to unofficial opinions of scientists concerning taxonomy that are not relevant here because taxonomic invalidity or error was not the basis of the 2016 de-listing decision, per 50 C.F.R. § 424.11(d), discussed *supra*. Rather, the decision relied on actual recovery of *luteolus*.

Safari Club argues "Plaintiffs cannot escape the conclusion that genetic augmentation from the UARB into the TRB, TRC, LARB and others will benefit the bears." ECF No. 25, at 17. We certainly can, because what Intervenors are urging is genetic swamping of the native *luteolus* genotype with non-native bears, which is unsupported by any relevant Record evidence. Again, *luteolus* in the TRB and LARB, while still meriting "threatened" status, were independently recovering with ESA protection and no **evidence** shows that they needed "genetic augmentation" with *americanus* genes.[15]

The FWS has on extremely rare occasions carried out such augmentation with genes from other non-endangered subspecies for an endangered subspecies that otherwise faced imminent extinction. Most notably in the case of the Florida panther (*Puma concolor coryi*), its inbreeding

---

[15] While some of the scientists referenced by Safari Club, including Laufenberg and Clark, suggested that additional genetic mixing could be beneficial to increase genetic diversity and population size of black bears in Louisiana, those authors had not done any scientific analysis to conclude that this was needed for the LBB in particular. Nor did their scientific analysis encompass consideration of the legal implications of the fact that the LBB subspecies, and not some hybrid, was listed under the ESA in order to preserve its unique genome, and that it was that subspecies that must be recovered to support an ESA delisting.

crisis and reduced sperm viability in the male cats required augmentation with related panthers from Texas (*P. c. stanleyana*) to literally save the Florida subspecies from extinction. However, that decision was only made after the population was down to a handful of breeding pairs, and it was supported by detailed, multi-year, deliberations that the FWS implemented under the Florida Panther Recovery Plan, as well as supported by several iterations of expert viability analyses.[16] Here, there has been no comparable genetic analysis by the FWS to examine whether the LBB populations were in such dire straits that there was no alternative but to interbreed with another subspecies. Indeed, the Minnesota bear introduction was done long before listing was even an issue. It was not done by the FWS, but by the Louisiana state game agency to foster sport hunting. *See* Answer to Complaint, ECF No. 6, at ¶ 58. And as detailed above, the translocations to the TRC to facilitate interbreeding between the TRC and UARB bears likewise were not based on any genetic studies concluding that interbreeding was the only way to save the subspecies. This is not just a matter of Plaintiffs' opinion. Nothing in the delisting Record nor, in particular, in the LBB Recovery Plan, AR 79, support the need for forced hybridization to save the LBB from extinction. *Post-hoc* seat-of-the-pants arguments about possible genetic benefits do not suffice.

---

[16] According to the FWS's Florida Panther factsheet: "Between 1991 and 1994, biologists convened three workshops to discuss the genetic health of the Florida panther population. Experts in the fields of genetics, conservation biology, captive breeding, and panther biology participated. Scientists concluded that some means of restoring a level of gene flow to the population was critical to improving the genetic health of the panther and its long-term prospect for recovery." *Available at* https://www.fws.gov/refuge/florida_panther/wah/panther.html. *See* FWS Florida Panther Recovery Plan, 3rd edition, at: https://www.fws.gov/uploadedFiles/Panther%20Recovery%20Plan.pdf, and numerous references therein, e.g., Seal, U. S., and R. C. Lacy (eds). 1992. Genetic management strategies and population viability of the Florida panther (*Felis concolor coryi*). Report to the U. S. Fish and Wildlife Service, by the Captive Breeding Specialist Group, Species Survival Commission, IUCN, Apple Valley, MN.

Nor do the facts here fit with the Safari Club Opposition's reliance, at 17-18, on *Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224 (10th Cir. 2000).  There, the plaintiffs who opposed the FWS's wolf reintroduction proposal argued that the original gray wolf subspecies (*Canis lupus irremotus*), still existed in the Northern Rockies and that the re-introduction could harm it.  The court found that based on new scientific evidence, the FWS was justified in concluding that the subspecies was extinct, and that introduction of another subspecies was therefore warranted.  The court found: "The factual, scientific determination that the subspecies *irremotus* no longer exists is supported by evidence in the record." *Id.* at 1239.  Here, the LBB Record shows exactly the opposite.  The *luteolus* subspecies is not extinct and there is no evidence that introducing another subspecies that will dilute its genetic distinctiveness will benefit it.  But, it may become extinct absent this Court's intervention.

What the Safari Club is arguing, to put it into wolf terms, is the equivalent of arguing that the rare Mexican wolf "lobo" subspecies, *C.l. baileyi,* should be delisted from the ESA, and its separate subspecies designation should be disregarded, if the FWS were to forcefully intermix it with a large population of non-endangered gray wolves trucked in from Canada and released in Arizona and New Mexico in *baileyi*'s range.  Here in the LBB case, the trucking and release of Minnesota animals occurred 50-plus years ago.  But, that historical fact does not change the nature of the ESA protections afforded to the separate native Louisiana subspecies.

## V.    THE FWS'S FAILURE TO CONSIDER LOSS OF HISTORIC RANGE AND POPULATION INVALIDATES ITS DELISTING DECISION

### A.  Historic Range

The FWS argues that it did consider loss of historic range as required by *Humane Soc'y of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017), but its brief only confirms that it did not.  The FWS notes only that it discussed the "significant range expansion" of the LBB between

the time of listing in 1992 and the time of delisting, and the increase in protected acreage within the current range, also since listing.  Opposition  at 23-24. While these discussions contain the word "range," they have nothing to do with historic range.  The comparison of range at the time of listing to range at the time of delisting does not address historic range at all, which the listing decision found had been severely depleted at the time of listing.  In fact, the listing decision found that suitable habitat had been reduced by 80% as of 1980, AR 63; 002212, and that listing was warranted based on "past habitat loss alone". AR 63; 002210.[17]

The FWS refers to loss of habitat as having been the "primary threat to the subspecies," Opposition at 25, and yet (at 23), points out that "the Recovery Plan does not list the restoration of Louisiana black bears to all or even a part of its historic range as one of the criteria for recovery".  However, the fact that it is not in the Recovery Plan does not mean that it was not required to be considered.  As stated in the final delisting rule, AR 654; 020060, recovery plans "are not regulatory documents and cannot substitute for the determinations and promulgation of regulations required under section 4(a)(1) of the Act."

In its final delisting rule, and in the entire process of determining the alleged recovery of the LBB, the FWS apparently made no attempt to calculate the size of the original range of the subspecies or even to compile a quantitative estimate of the size based on the map of "historic range" shown in its own 5-year review.  AR 391; 016868.  However, we have compiled the

---

[17] The Safari Club brief likewise points to findings in the delisting decision that it claims meet the requirements concerning analysis of loss of historical range.  However, the FWS findings referenced by Safari Club also concern the increases in habitat and habitat protection since listing, as well as predictions concerning future habitat losses – not an examination of how the loss of historic range affects the species today.  Safari Club Brief, ECF No. 26, at 21.  The flaw in Safari Club's argument is evidenced by how it frames the question – as whether "present or threatened destruction of range still poses a risk to species survival."  However, the right question is whether *past* loss of range still threatens the species, not whether continuing losses in the present and future threaten the species.

following figures for the size of the state areas, not including Arkansas, within the historic range

shown on that map:  Louisiana, 44,521 square miles; Mississippi, 27,737 square miles; and

Texas, 40,573 square miles.  Therefore, the minimum total historic range is 112,831 square

miles.  The total current area supporting LBB breeding populations, not including the non-

*luteolus* UARB group, is 2,369 square miles.  AR 654; 020053, table 1.  Using those figures, the

subspecies now would be resident in only about two percent of its historic range.  *See* Plaintiffs'

Opening Brief, ECF No. 24, at 14.

The delisting decision does not grapple with the effect of these massive losses on the

species today, as the D.C. Circuit requires.  *Humane Soc'y*, 865 F.3d at 605-06.  The question, as

the FWS states in its own Range Policy, is whether the "loss of historical range is so substantial

that it undermines the viability of the species as it exists today." *Id.* at 605 (quoting "Final Policy

on Interpretation of the Phrase 'Significant Portion of Its Range' in the Endangered Species Act's

Definitions of 'Endangered Species' and 'Threatened Species'" ("Range Policy"), 79 Fed. Reg.

37,584 (July 1, 2014)).  The FWS did not attempt to delineate the historic range, compare it to

the range today, or analyze the effect of historic range loss on the species today.  Instead, the

agency rested its delisting decision on the modest increases in range since listing and the claimed

"viability" of the current remnant populations.  AR 654; 0020078.  This is exactly what the

*Humane Society* decision found it could not do.

The D.C. Circuit found that "consideration of material changes in a species' historical

range is critical to a reliable assessment of sustainability within the current range," and that a

prognostication about future viability "cannot be reliably reasoned if it was made in a historical

vacuum.  An important factor—the possible enduring consequences of significant loss of

historical range—was left out of the analysis all together." *Humane Soc'y,* 865 F.3d at 606.  The same is true here.

The *Humane Society* court set out particular matters that must be analyzed as prerequisites to proper consideration of loss of historic range, including defining the physical boundaries of the historic range and establishing the appropriate timeframe for measuring it.  *Id.* at 606-07.  This has not been done here to analyze the impact of loss of historic range, and as in *Humane Society*, "the Service's wholesale failure to address that factor renders the Service's decision unreasoned, arbitrary, and capricious."  *Id.* at 607.

The fact that the LBB now occupies only around two percent of its historic range underlines the importance of this requirement here.

### B.  **Historic Population**

The FWS excuses its failure to consider the loss of historic population on the LBB today based on its claims that population estimates are not reliable, and therefore it relied instead on its finding that existing populations were stable to increasing and "viable."  It claims it is owed deference on its choice to rely on those metrics instead of looking at loss of historic population.  However, those metrics are only looking at present, and not historic, population, and just as with historic range, conclusions that currently existing populations are "viable" cannot be made in a historic vacuum without consideration of how the loss of historic population is affecting the species today.  One might ask, how can there be a claim of recovery if there is no idea of what was originally present?

In addition, as explained in Plaintiffs' opening brief, the Laufenberg and Clark viability analysis relied on by the FWS, as well as its conclusion that the criteria in the Recovery Plan have been met, are critically undermined by its inclusion of the non-*luteolus* UARB in the

analyses.  This increases the importance of looking at other factors, such as the loss of historic population.

There is sufficient evidence in the Record to make a reliable estimate, despite the FWS's claims to the contrary, including the agency's own estimate, AR 63; 002213—"Black bear populations range in density up to one to two per square mile"—which can be applied to the FWS's own delineation of historic range, AR 391; 016868 (see above) to calculate a historic population as great as 113,000 to 226,000 individuals.[18]  As there are fewer than 700 LBB in existence today,  AR 654; 020053-020059, *see* ECF No. 24, at 14, the current population is a tiny remnant of the historic population, and the current effects of the dramatic loss must be analyzed.

## VI.    THE FWS'S SPR ANALYSIS FOR THE LARB POPULATION IS UNREASONABLE

Under its 2014 Significant Portion of Range (SPR) Policy, which the FWS itself pointed out has been successfully challenged in court, the FWS must identify whether any portions of a species' range warrants further analysis by first assessing whether there is substantial information indicating that the portion may be significant, and the species may be in danger of extinction in those portions or likely to become so in the foreseeable future. AR 415; 017476-78 (see Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgement, ECF No 24, at 35-38).  The FWS improperly dismissed several inconsistences in its initial inquiry into whether there is substantial information indicating that the LARB population may be threatened and significant.

---

[18] The FWS's suggestion that current "reduced and highly fragmented habitat," with agriculture, may have produced population densities greater than in the past, AR 654; 020072, is contradicted by substantial data, also in the delisting rule, showing that disturbed, fragmented, or agricultural habitat, is far less favorable to bears than is natural forested habitat, and is actually a primary threat. AR 654; 020052; 020053; 020082; 020093.

In the delisting rule, the FWS acknowledged that the LARB population and its supporting habitat face threats that are geographically concentrated, including isolation and low probability of interchange, future anticipated development and the long-term threat of sea level rise. AR 654; 020095.  In both the delisting rule and its Opposition brief, the FWS quickly dismisses these concerns, however, by suggesting that successional changes in LBB habit within the Atchafalaya Basin, and the adaptability of bears will somehow offset these threats. *Id.*; ECF No. 28, at 30-31.

The FWS's reliance on successional changes in the Basin as a result of sedimentation is not only problematic for a number of reasons discussed below, but it also contradicts one of the two studies cited in support of its sediment prediction. Hupp et al. (2008), the more recent of the two sediment studies cited in the delisting rule, acknowledged the growing concern of sedimentation in the Atchafalaya Basin, but concluded that there was "no net storage of sediment in the Basin" and that as a consequence, the Atchafalaya Deltas area actually are growing. AR 218; 008729 ("Presumably, the sediment load leaving the Basin is derived mostly from in-channel stores and functions much like a reservoir in equilibrium, where sediment trapping is matched by sediment transport out of the Basin.").  This study found equilibrium such that sediment is temporarily stored in the Basin and ultimately flushed out to the growing delta, thus supporting its conclusion of no net storage of sediment in the Basin.  This shows not only a failure on the part of the FWS to understand the hydro-dynamics of the Basin, but that the FWS's speculative and controversial future predictions for the Basin are unsupported by the record.

Sedimentation alters the physiography, hydrology, water quality, landscape and habitats of the Basin. *See* AR 301; 012201. Such extreme alterations to the Basin's hydro-dynamics will impact previously protected habitat between the LARB and UARB subpopulations (AR 249; 009517, "Special Management Considerations or Protections"), as well as other wildlife habitat,

29

economics and public safety in the Basin. *See* AR 393; 016922 (discussing the importance of wetlands for numerous species of special concern and the expectation that wetlands are expected to be the most impacted by climate change); AR 148; 005031 ("Floodplain wetlands can be overwhelmed and/or severely degraded if . . . unnatural loads of sediment are not reduced"); AR 654; 020088 and AR 301; 012201 (explaining how the Basin by way of the Morganza Floodway functions as a spillway for the containment and diversion of floodwaters from the Mississippi River). Thus, while the FWS asserts that increased sedimentation in the Basin *may* improve LBB habitat conditions to offset the long-term threat that sea level rise poses to this population (ECF No. 28, at 31; AR 654; 020056 (emphasis added)), it fails to address the foreseeable repercussions of this phenomenon.

Rapid filling in of the Basin would have catastrophic affects as a result of floodwaters and hydrologic alterations, impacting public health and safety, as well as ecology and wildlife in and around the Basin. *See* AR 301; 012211 (effects of uneven sedimentation on water quality and flow); AR 148; 005031 (discussing how floodplain wetlands and restored vegetation can be degraded and destroyed by sediment filling). The expansive reach of floodwaters not contained in the Basin spillway could impact LBB populations beyond the LARB. Consequently, increased sedimentation at an unsustainable rate may also contribute to the threat of hybridization of the *luteolus* LARB population with the alien UARB population without further intervention by the FWS.

The agency's presumption of sedimentation fails to account for ongoing efforts by state and federal governments to restore the Basin and reduce sedimentation (AR 218; 008718 and AR 301; 012212), including specific projects aimed at sustainable "prevention or management of sediment into the interior swamps." AR 301; 012229 (*e.g.*, Buffalo Cove and Beau Bayou).

Despite the purpose of many existing regulatory mechanisms relied upon by the FWS which aim to protect the hydrologic and ecologic functions of the Basin's wetlands from destruction by sediment or other means, (33 U.S.C. § 1251(a); 33 C.F.R. § 332.3(a)(1)), the agency's delisting does not contain any analysis as to whether sedimentation resulting in more suitable bear habitat in the Basin is tenable.  In any event, the FWS has not adequately addressed the foreseeable impacts that will come to pass if the Basin fills in or not, how it will ultimately impact the LARB population, and how it will affect the entire LBB population.

The FWS's reliance on the LBB's "ability to adapt" and likelihood of moving "into more suitable areas" likewise falls short of reasonable given the weight of evidence in the record. *See* Opposition at 31; AR 654; 020091-92. In support of adaptability, the FWS relies on studies following the bears' response to the 2011 opening of the Morganza floodway, and the habitat impacts from Hurricanes Katrina and Rita.  Therein, despite finding no significant impacts to the population numbers or habitats as a result of these events viewed in isolation, the authors conclude that the ability of LBBs to cope with repeated flooding or increased frequency and severity of extreme weather events is unknown, contrary to what the agency has stated. AR 391; 016850 ("An increase in extreme weather events could result in the necessity of more frequent openings resulting in increased effects on Louisiana black bear population dynamics." AR 306; 012320 (in which authors Jennifer L. Murrow and Joseph D. Clark discuss future flooding and land subsidence that may impact suitable bear habitat, "the precariousness of small, isolated populations" and the potential for different results had "the trajectories and intensities of the hurricanes been otherwise.").  Regardless of whether the Basin's hydrology alters significantly as a result of sediment, experts including Joseph D. Clark estimate that "the frequency of severe floods is expected to rise in the future as a result of climate change." AR 388; 016788 (K. C.

O'Connell-Goode et al., *Effects of a flooding event on a threatened black bear population in Louisiana,* (2014)). Thus, reliance on the LBB's ability to adapt in the future is not reasonable.

Additionally, the Administrative Record calls into question whether male or females bears in the LARB can or will travel the substantial distance through the Atchafalaya Basin to escape the certain threat of sea level rise and subsidence. *See* AR 362; 016162 and 016170 (discussing the nearly nonexistent dispersals from LARB to other subpopulations, noting that there is "(n)o evidence of natural female dispersal between subpopulations"). This is irrespective of the FWS's finding that "the habitat between (the LARB and UARB) within the Basin is believed to be too wet currently to support breeding females, *although bears have been observed along the higher areas on both sides of the Basin.*" AR 654; 020095 (emphasis added)). While road mortalities pose a continuing threat and barrier to the LARB population's movement, the Record suggests indicates an increased threat of flooding-induced vehicular collisions as bears move to higher ground. AR 391; 016849. The LARB subpopulation has the lowest estimates of female bear survival, attributable in part to a high degree of mortality as a result of vehicular collision and nuisance-related removal. *See* AR 654; 020056. Therefore, in the face of more extreme threats to its breeding habitat by the coast, and the necessity to move north to escape climate-related threats, the likelihood of vehicular collision will increase.

Further, the FWS argues it reasonably concluded that the LBB is not threatened in the LARB on the basis that it lacked "substantial information" to indicate otherwise because the subpopulation is "stable to increasing." Opposition at 29, 30. In the delisting decision, the FWS agreed that "providing habitat protection for breeding female Louisiana black bears is important to ensure long-term population viability." AR 654; 020077. Yet, the FWS ignores the aforementioned barriers to movement and current and future threats to bears in the LARB,

instead relying on the stability of the population to conclude LARB is not threatened. The FWS found that "if the current stability or increasing size continues, it is unlikely that the subspecies would be in danger of extinction (or likely to become so) in this portion of its range." AR 654; 020095.  However, it cannot substantiate the likelihood that the numbers will remain stable or will increase without ESA protections.  Although the FWS contends that it was not required to conduct a viability analysis for the LARB population (Opposition at 30),[19] it cannot reasonably ignore available data before it that indicates the LARB may not be viable. *See San Luis & Delta-Mendota Water Auth. v. Locke,* 776 F.3d 971, 995 (9th Cir. 2014). Moreover, the agency failed to provide a reasonable explanation of cumulative effects or the interactions of threats to the LARB. *See WildEarth Guardians v. Salazar,* 741 F. Supp. 2d 89, 101 (D.D.C. 2010) (holding that the Service's denial of a petition to list the Utah Prairie Dog as endangered was arbitrary and capricious because the Service did not consider the cumulative effect of the threats to the species). If the Record shows anything, it is that further analysis of foreseeable threats to the LARB population is warranted. The FWS's preliminary analysis of the LARB's status was unreasonable and not supported by evidence.

---

[19] The FWS distracts from the underlying issue of the status of the LARB population with claims that it did not have to conduct a viability analysis for the LARB. Even so, the FWS made representations in the 5-Year Review that it was assessing the viability of the LARB population: "A population viability study is underway but not yet complete. The long-term viability of the LARB population is unknown but currently under investigation." AR 391; 016809 (discussing also that LDWF contracted with USGS et al. "to model the viability of the TRB, UARB, *and LARB* populations."). Specific recommendations within the 5-Year Review included completion of the viability studies for the TRB, UARB, *and the LARB populations.* AR 391; 016853. Further, the delisting decision suggestions that, following its review of  "all known activities that could potentially threaten the Louisiana black bear", it found that "based on the analysis of population viabilities … and the level of occurrences, they do not represent significant threats." AR 654; 020070.  This incorrectly suggests that it based its analysis of threats against the viability threshold of the subspecies, but it has been made clear throughout the delisting decision that a viability analysis was not completed for the LARB. AR 654; 020095.

The FWS further asserts that there is not substantial information indicating that the LARB population is "significant" because the TRB and UARB subpopulations have long-term viability. ECF No. 28, at 31-32. However, the UARB population is not the listed *U. a. luteolus* subspecies and the FWS has failed to analyze the significance of the LARB in light of this fact. Also, the FWS acknowledged that the LARB is the second largest population of LBB (Opposition at 30; AR 654; 020056); and that "the presence of the relatively large LARB subpopulation and projections for improving habitat conditions (refer to Factor A and D discussions) between it and the more northerly UARB subpopulation contributes to the persistence of the Louisiana black bear population as a whole."  AR 654; 020062. Yet, the FWS concluded that "even if LARB were lost completely (which, as explained above, is unlikely based on population and growth estimates), it is 'unlikely' that the Louisiana black bear would be 'in danger of extinction'". ECF No. 28, at 32.  However, as in *Desert Survivors,* the agency's finding that there was not substantial information indicating that the LARB population may be significant "must necessarily have been informed by the Service's understanding of the meaning of 'significant' under the SPR Policy." *Desert Survivors v. U.S. Dept. of the Interior,* Doc. No. 152 at 77.[20]

In *Desert Survivors,* the Court considered whether the agency's interpretation of the word "significant" in the SPR Policy was permissible, or in other words, "whether the definition of

---

[20] The published order in this case confirmed the District Court's summary judgment finding on the SPR Policy's impermissible interpretation of "significant", finding the Policy deficient as a matter of law, and setting aside the unlawful "significant portion" part of the Policy, and applying its holding nationwide. *Desert Survivors v. U.S. Dept. of the Interior,* 336 F. Supp. 3d 1131 (N.D. Cal. 2018). Here, Plaintiffs cite to the unpublished summary judgment order on the SPR Policy's "significant" definition in the case. *Desert Survivors v. U.S. Dep't of the Interior,* Case No. 16-cv-01165-JCS, ECF No. 152 "Order re Summary Judgment Motions" (May 15, 2018, Dist. N. Cal.).

'significant' in the SPR Policy gives independent meaning to the phrase 'significant portion of its range' in the ESA." *Desert Survivors v. U.S. Dept. of the Interior,* Case No. 16-cv-01165-JCS, ECF No. 152 at 80. The *Desert Survivors* opinion, quoting Judge Marquez's conclusion in *Center for Biological Diversity v. Jewell,* 248 F. Supp. 3d 946, 958 (D. Ariz. 2017), reasoned "[t]he Final SPR Policy's requirement that a portion of a species' range can be considered significant only 'if the species is not currently endangered or threatened throughout all of its range,' 79 Fed. Reg. at 37,582—far from ensuring that the 'significant' and 'all' language of the ESA will retain independent meaning—actually ensures that a portion of a species' range will never be considered significant based on accurate application of the Final SPR Policy." *Desert Survivors,* Case No. 16-cv-01165-JCS, ECF No. 152 at 81. "If a portion of a species' range is so vital that its loss would render the entire species endangered or threatened, and the species is endangered or threatened in that portion, then the entire species is necessarily endangered or threatened." *Id*., at 82.

Here, the FWS affirms the contribution of the LARB to the persistence of the LBB while dismissing the loss of the LARB in its entirety. This case illustrates that, not only did the FWS fail to provide reasonable analysis to reconcile its dismissal of the LARB in consideration of its size and contribution to the persistence of the LBB, but it highlights the superfluous and illusory distinction the FWS proposed in the SPR Policy's interpretation of "significance". Under the agency's challenged SPR Policy definition of "significant", there is no scenario under which the LARB could be "significant" and threatened that would not necessitate relisting of the LBB on the basis of the species' threats analysis alone. Similar to the examples applying the agency's SPR Policy definition of "significant", which the *Desert Survivors* court vacated nationwide, the SPR significance analysis of the LARB is likewise superfluous because the threatened status of

this population alone necessitates relisting of the entire subspecies, and reconsideration of the LBB Recovery Plan criteria.

Regardless of whether this Court accepts or rejects the SPR Policy's flawed interpretation of significant, the agency's SPR analysis of the LARB bears and habitat is deficient and unreasonable.  Because the FWS made significant errors in its SPR preliminary analysis in failing to account for the substantial threats to the LARB and its contribution to the future of the LBB subspecies as a whole, its SPR finding was arbitrary and capricious and should be vacated. *Defenders of Wildlife v. Jewell,* 176 F. Supp. 3d 975 (2016).

## VII.    EXISTING REGULATORY MECHANISMS ARE INADEQUATE TO ADDRESS THREATS TO THE LBB

Both the FWS and Safari Club incorrectly argue that existing regulatory mechanisms are sufficient to protect the LBB from the threat of habitat destruction. ECF No. 28, at 38; ECF No. 25, at 26.  e Safari Club claims that the FWS correctly assessed existing regulatory mechanisms in light of its assessment of other threats to the species (ECF No. 25, at 26), but as discussed above, the FWS's threats assessment was deficient and flawed for a number of reasons including its inclusion of the non-*luteolus* population in the UARB to ascertain LBB viability. Thus, under the reasoning in *Friends of Blackwater v. Salazar,* the Court should consider the inadequacy of existing regulatory mechanisms in light of the remaining threats to the LBB and the FWS's failures to adequately account for them. 691 F.3d 428, 436 (D.C. Cir. 2012). While Safari Club contends that the threat of habitat loss is reduced or reversed, both Safari Club and the FWS allege that protections under the Clean Water Act (CWA) and other non-ESA laws adequately protect LBB habitat. ECF No. 25, at 26; ECF No. 28, at 27. There is substantial evidence in the record to rebut the FWS's contradictory conclusions regarding protection of LBB subpopulations and habitat under existing regulatory mechanisms.

A. **Plaintiffs Presented Evidence of Harm from Removal of Federal Habitat Protections**

Plaintiffs offered sufficient evidence, which the Record reinforces, to show that the removal of critical habitat designations foreseeably would impact areas that were previously designated as critical habitat. See ECF No. 24, at 40-42.[21]   The FWS suggests that the Court should not consider the case references challenging Federally-permitted actions subsequent to the delisting decision.   These examples merely demonstrate the importance of the critical habitat protections, and question the efficacy of compensatory mitigation in a wetland ecosystem as dynamic as the Atchafalaya Basin. *See* AR 148; 005022, 005030-005031 (study identifying the importance of hydrologic restoration and the shortcomings of mitigation, particularly in uplands, in reforestation endeavors); AR 102; 003755-003756 (identifying reforestation efforts as

---

[21] Plaintiffs specifically reference two cases (*Atchafalaya Basinkeeper, et al. v. U.S. Army Corps of Eng'rs,* No. 3:18-cv-23-SDD-EWD (M.D. La. 2018) (during the permitting process for this project, following the delisting of the LBB, the FWS stated: "Due to our recently reduced role in the wetland regulatory program, we have not provided input on the adequacy of the final mitigation plan for this project, and we therefore defer to the other natural resource management agencies regarding the current mitigation proposal."); *Louisiana Crawfish Producers Association-West, et al. v. U.S. Army Corps of Eng'rs,* No. 6:11-cv-00461-FRD-PJH (W.D. La. 2011)) challenging development projects in the Atchafalaya Basin, in areas contained in the critical habitat designations for the LBB. *See* AR 249; 009521 and 009532 (describing and depicting the southern half of Unit 2); the Bayou Bridge Pipeline crosses the Atchafalaya Basin and formerly designated LBB habitat in St. Martin parish; the Fisher Lake project area covers 600 acres of high quality swamp and bottomland hardwoods also within formerly designated critical habitat in Unit 2 on the west side of the Atchafalaya Basin. These cases identify the importance of protections afforded listed species under the ESA, and critical habitat in particular, illustrating the shortcomings of existing regulatory mechanisms. This is particularly important in the Atchafalaya Basin as the FWS predicts rapid sediment transforming the Basin's hydrology and converting cypress-tupelo swamps into bottomland hardwood forests, despite the documented importance of den trees to breeding females. AR 249; 009516 ("Tree dens may be an important component for female reproductive success in areas subject to flooding . . . Den trees located in cypress swamps would appear to provide an increase in security"); AR 391; 016821 ("In areas where seasonal flooding occurs, the presence of suitable den trees may be a critical habitat component."); AR 654; 020076 ("large trees with cavities often provide high-quality den sites for bears (particularly females with young-of-the-year-cubs).").

potentially less effective at "replacing the ... functional values" of natural bottomland hardwood forests). Intervenors would have the Court conclude that the critical habitat designation was essentially meaningless in suggesting that "non-ESA regulations perform functionally the same role as the critical habitat designation and apply to both listed and non-listed species." ECF. No 25, at 29.  However, such a conclusion negates the purpose and need for critical habitat designations upon listing a species such as the LBB under the ESA.

The FWS's assertions now also contradict the agency's earlier finding that areas designated as critical habitat for the LBB contained the "physical and biological features **essential to the conservation of the subspecies**" and that the protection of these areas under the ESA "will provide benefits in addition to those provided through private landowner incentive and conservation programs, and will further conservation of this subspecies." AR 249; 009501 and 009505 (emphasis added).  The FWS found that critical habitat was vital for the conservation of the LBB, concluding that "critical habitat designations may provide greater regulatory benefits to the recovery of a species than would listing alone." AR 249; 009523.

### B.  State Management Plans for the LBB Are Inadequate

There is a noticeable deficiency in Louisiana State plans for LBB management pertaining to the LARB population, particularly in comparison to the robust monitoring of the UARB and TRB populations.  The Louisiana Department of Wildlife and Fisheries' (LDWF) LBB Management Plan adopts and employs the LBB Post-Delisting Monitoring Plan (PDMP) to monitor trends in LBB populations and habitats and ensure the status does not deteriorate. AR 500; 018820.  Yet, in the PDMP, in contrast to extensive monitoring plans in the areas supporting the UARB, TRB and TRC populations, there is no discussion of monitoring forested habitat within jurisdictional wetlands between the LARB and other LBB populations. AR 642;

019997-98.  Without sufficient monitoring of these areas supporting habitat between the LARB

and other LBB populations, the LDWF will lack necessary habitat information indicating the

need to initiate a formal federal ESA status review for this subpopulation. *See id.* at 020004

(discussing triggering conditions for status review to assess changes in threats, including declines

in forested habitat supporting breeding subpopulations and between).  As recent as 2014 in the 5-

Year Review, the FWS found that habitat fragmentation still exists between breeding

populations, and "(e)xchange between breeding populations is a critical need for long-term

viability." AR 391; 016847.  Further, the State plans for LBB management do not address the

threats posed by the agency's improper inclusion of the non-*luteolus* subpopulation in its status

analysis and its dismissal of threats to the LARB bears and habitat.

### C. <u>Existing Regulatory Mechanisms Are Inadequate in Light of Remaining Threats to the LBB and its Habitat</u>

The FWS's inconsistent analysis regarding future trends to LBB habitat in the

Atchafalaya Basin, combined with the agency's failure to provide a reasonable explanation for

its discounting of the current and future threats to the LARB population, highlight the continued

need for the habitat protections afforded to the subspecies under the ESA. The FWS has not

reconciled its previous finding that the CWA was insufficient to protect LBB corridor habitat

(AR 654; 020063), beyond conclusory references to litigation that predated the LBB's listing and

critical habitat designation. The delisting rule fails to show how the regulatory landscape has

been substantially altered to now provide adequate protection for LBB habitat. Finally, now no

federal or state regulatory mechanisms are in place to protect the *luteolus* subspecies from the

current and future threat of hybridization with the non-*luteolus* UARB bears. The agency's

failure to consider this threat and the inadequacy of existing regulatory mechanisms to address it

warrants relisting and further protection of the *luteolus* subspecies.

## VIII.   PLAINTIFFS HAVE DEMONSTRATED THEIR STANDING TO CHALLENGE THE DELISTING OF THE LBB

Despite Intervenor's claims, Plaintiffs can satisfy Article III constitutional standing requirements.  At least one plaintiff must demonstrate (1) an "injury in fact," (2) that is "fairly traceable to the challenged action of the defendant," and (3) it is likely the injury will be "redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  All plaintiffs satisfy these requirements, showing by declarations and in their Complaint injury to a cognizable interest traceable to the Service's delisting determination, that is redressable by a favorable decision of this Court.

For purposes of adjudicating Plaintiffs' standing at the summary judgment stage, the Court must take as true the specific facts demonstrating standing provided by affidavit or other evidence.  In addition, the Court must assume that plaintiffs will prevail on the merits – meaning in this case that the Court will find the delisting decision invalid and that the LBB must be returned to the ESA's List of Endangered and Threatened Wildlife.  *Town of Barnstable v. F.A.A.*, 659 F.3d 28, 31 (D.C. Cir. 2011); *Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 16 (D.D.C. 2011).

Safari Club contradictorily argues that Plaintiffs lack standing because the relief they seek will not provide redress for their injuries. How can the redress Plaintiffs seek harm the Safari Club, as it claimed to support its intervention, but at the same time not help the Plaintiffs? In fact, if Plaintiffs prevail on the merits, these outcomes would come to pass:

A)  The delisting rule would be rescinded and the LBB restored to ESA threatened status, which would have the effect of preventing any future legal take of the bears;

B) The LBB's critical habitat designation would be restored;[22]

C) The FWS's future recovery efforts would have to be focused only on true *luteolus* populations;

D) The results of those efforts in combination with the restored critical habitat designation would be to protect more LBBs, and more LBB habitat, within the Atchafalaya and Tensas Basins;

E) The more non-hybridized bears that exist, and the broader their distribution, the more that Plaintiffs (and others) would be able to see, enjoy, and even eventually hunt LBBs, should they become recovered enough to remove their ESA status; and

F) The end result would vastly advance the conservation goals, aesthetic desires, recreational utilization, reduced hybridization and other interests associated with LBB recovery that Plaintiffs' numerous standing Declarations express.

The merits of Safari Club's standing arguments are near zero because they chose to ignore all of the above outcomes should the Plaintiffs obtain the redress they seek, all of which are attainable with a favorable ruling.  The FWS, to its credit, did not bother with the same fruitless standing challenge.

Safari Club posits that Plaintiffs seek to stop hunting, and claim that hunting will not necessarily harm the LBB.  However, Plaintiffs did not base their standing claims on a particular interest in precluding hunting, but rather on an interest in providing the LBB with all the protections afforded by the ESA.  One among many such protections is a prohibition on "take,"

---

[22] The elimination of the Critical Habitat protections in 2016 has opened up more development in vital habitat areas, as Plaintiffs document in their opening merits brief, section VI. Existing Regulatory Mechanisms are Inadequate to Protect LBB Habitat in the Atchafalaya Basin.

including hunting, as long as the species is listed.  However, Plaintiffs do not generally oppose hunting and several of the Plaintiffs and their members are hunters.

The larger point is Safari Club's unwarranted assumption that the protections conferred by the ESA – whether in preventing "take" or in providing critical habitat or other ESA protections – do not actually benefit the LBB, and therefore the Plaintiffs' and their members' opportunities to observe, study, and enjoy the presence of the LBB are not harmed by delisting. However, if the Court assumes, as it must, that Plaintiffs will prevail on the merits, it means that the LBB is still in need of ESA protection, and that renewed protection will benefit the species and therefore the Plaintiffs' interests.

Any doubt that ESA protections actually benefit species, and conversely, that their loss harms species, is unsupported by anything in the record of this case and is directly contrary to congressional and judicial findings about the ESA.  As the Supreme Court stated in *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978):

> The Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation. Its stated purposes were "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such . . . species . . . " 16 U. S. C. § 1531 (b) (1976 ed.). In furtherance of these goals, Congress expressly stated in § 2 (c) that "all Federal departments and agencies *shall* seek *to conserve endangered species* and threatened species . . . ." 16 U. S. C. § 1531 (c) (1976 ed.). (Emphasis added.) …. Aside from § 7, other provisions indicated the seriousness with which Congress viewed this issue: Virtually all dealings with endangered species, including taking, possession, transportation, and sale, were prohibited, 16 U. S. C. § 1538 (1976 ed.), except in extremely narrow circumstances, see § 1539 (b). The Secretary was also given extensive power to develop regulations and programs for the preservation of endangered and threatened species. § 1533 (d).

The Court must assume that ESA protections have enormous value to species, and their unjustified removal harms those species and those who have a connection to them.

A common-sense question is available to determine whether Safari Club's standing challenge holds water: if Plaintiffs lack standing, is there anyone else who could have standing under Safari Club's test?  If Plaintiffs' expert LBB biologists, long-time LBB conservation advocates who have worked for the bear for literally four decades, Atchafalaya Basin residents who depend on healthy LBB habitats for their living, and other natural resource protectors do not have standing, no one else possibly could. Actually, under the Safari Club test, only <u>hunters</u> have standing, and only to defend delistings or oppose listings, which cannot be the law.

The Safari Club argued it should be allowed to intervene and had standing because if Plaintiffs obtained the redress they sought it would harm the Club's members' prospects for hunting. ECF No. 13, at 2.  Beyond hunting, the Safari Club stated it had legal interests, meriting intervention, in arguing about "…issues under the ESA that Safari Club has litigated before and has an interest in addressing, including hybridization, historical habitat, peer review, and assessment of the listing factors, to name a few." *Id.* at 14.  It is remarkably hypocritical to argue that Safari Club's interest in arguing those issues was sufficient to get it into Federal court, but that Plaintiffs' interests in arguing the other side of the same issues is inadequate to keep them in at this late stage.

This Court found Safari Club had standing and the right to intervene. ECF No. 22.  The Court's reasoning was based on this point (p. 4):

> *However, if plaintiffs prevail, the relisting of the Louisiana black bear on the threatened species list will serve as a complete bar on Safari Club's pursuit of its preferred conservation approach.*

Conversely, if the Intervenor and the FWS prevail, it would serve as a complete bar to Plaintiffs' preferred conservation approach, which is to promote more non-hybridized *luteolus* bears on the Louisiana landscape with stronger ESA-based protections, including for their habitat.  It would

43

be fundamentally unfair for the Court to allow Safari Club to litigate on behalf of its preferred approach, but to deny Plaintiffs that same right.

### A.   Plaintiffs Have Shown Injury in Fact to a Cognizable Interest

The "injury in fact" requirement involves injury to an interest that is "concrete and particularized" and "actual or imminent." *Lujan,* 504 U.S. at 560.  Plaintiffs have established a cognizable interest in the protection of the LBB and its habitat.  *See Lujan*, 504 U.S. at 562-63, citing *Sierra Club v. Morton,* 405 U.S. 727, 734 (1972)) ("the desire to use or observe an animal species, even for purely aesthetic purposes, in undeniably a cognizable interest for purposes of standing."); *Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426, 432 (D.C. Cir. 1998) ("The Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing").

Moreover, any injury, whether large or small and whether monetary or non-monetary, supports standing.  *See Otter v. Salazar*, Case No. 1:11-cv-00358-CWD, at *26-27 (D. Idaho Aug. 8, 2012) ("The very fact that the Ranchers' operations have been subjected to Section 7 consultation under the ESA supports the finding that the Ranchers have standing"); *cf. Carpenters Indus. Council v. Zinke*, 854 F.3d 1,5 (D.C. Cir., 2017) (when adjudicating a challenge to Article III standing ". . . **the amount is irrelevant**.  A dollar of economic harm is still an injury-in-fact for standing purposes") (emphasis added); *Hydro Resources, Inc. v. EPA*, 562 F.3d 1249, (10th Cir. 2009) ("the unwanted result of the government rule whether or not [there was an associated] pecuniary loss suffices as an injury in fact"). (alteration in original, quotation marks omitted) (vacated on other grounds in 608 F.3d 1131 (10th Cir. 2010)).

Plaintiffs' declarations describe an array of interests in observing and studying the Louisiana black bear, and protecting the bear and its habitat throughout Louisiana and the Atchafalaya Basin in particular. *See, e.g.,* Caire Decl. at ¶ 12 ("I have spent many years studying

the Louisiana black bear and visiting and observing its habitat in Louisiana, and plan to continue to do so."); Nowak Decl. at ¶¶ 6, 9–15 ("Over the past fifty-six (56) years, I have made numerous trips to and through Louisiana, often for the purpose of observing, learning about, and conducting research on bears, wolves, and other wildlife of the state."); Meche Decl. at ¶ 15 ("Our members have long observed and captured on game cameras the presence of the black bear in the Basin. We have and will continue to seek to observe the Louisiana black bear in its native habitat in the Atchafalaya Basin."); Wilson Decl. at ¶ 13 ("Basinkeeper works to protect the long-term health and sustainability of the Atchafalaya Basin.  This includes protecting and restoring wildlife habitat.... including the Louisiana black bear.").

At the summary judgment phase, Plaintiffs must set forth "a factual showing of perceptible harm." *Lujan,* 504 U.S. at 566.  Plaintiffs allege injury to their scientific, professional, recreational, and aesthetic interests as a result of the delisting decision in so far as the delisting removed necessary protections to the Louisiana black bear populations and habitat. The injuries stem from the ongoing threats to the long-term survival of the LBB subspecies, now unaddressed by the ESA, including habitat loss, development in its critical habitat, climate change, hybridization, and the LBB's still precariously small population and range, despite the gains previously made as a result of ESA protections.  The loss of ESA protections results in the likelihood of there being fewer bears to observe, study and enjoy. For example, *see* AR 649; 020040 (illustrating observed bear mortality between 1992-2015, identifying vehicular mortalities along U.S. 90 and I-20 (in the LARB and TRB subpopulation areas respectively) as the primary cause of bear deaths, with a total of 390 *known* mortalities during this time-period); AR 391; 016844 (recognizing less than a year before publication of the proposed delisting that road related mortality posed "a continuing threat" to the LBB); and AR 642; 019987 ("Highway

and other human-induced incidental mortalities as well as suspected illegal killing, threats since the time of listing, may continue to negatively affect Louisiana black bears."). *See Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 97 (D.C. Cir., 1995) ("in these cases, the plaintiffs asserted injury because the challenged conduct threatened to diminish or deplete the overall supply of endangered animals available for observation and study.").

In addition, Plaintiffs have described a particular, actual injury stemming from hybridization of native *luteolus* with the translocated *americanus* bears from Minnesota. *See, e.g.,* Nowak Decl. at ¶ 16 (explaining how the delisting under the FWS's inappropriate application of its Recovery Plan based on reliance of the UARB population "allows for the continued exposure of true native *luteolus* to the risks of hybridization" and concern that the delisting will have "serious impacts to the genetic integrity of *luteolus*, and on its habitat."); Complaint at ¶¶ 61, 63 (describing how the FWS's translocation of bears to the TRC has led to hybridization that was not previously occurring). Specifically, these Plaintiffs have an interest in protecting any genetic material unique to the Louisiana black bear, and the increased risks of hybridization as a result of delisting based on reliance of the UARB population directly impair that interest. *See* Nowak Decl. at ¶ 16; Caire Decl. at ¶ 15. Increased hybridization inevitably results in diminished numbers of true, native *luteolus*, and thus diminished opportunities for plaintiffs to observe and study the LBB in its natural habitat. If Plaintiffs were to prevail based on their arguments that the UARB is not *luteolus* and should not be considered as part of the LBB population for delisting purposes, and that because the UARB is not *luteolus*, the Recovery Plan criterion for two viable and interconnected populations of LBB has not been met, the FWS would need to re-list the bear and pursue recovery of true *luteolus* populations, serving to redress this injury.

Plaintiffs' injuries also stem from the loss of critical habitat of the LBB in conjunction with the delisting decision. Meche Decl. at ¶¶ 17-19, 21; Wilson Decl. at ¶¶ 22-26.  If the Court restores the listed status of the LBB, and thereby revives its critical habitat designation, that would provide redress for these injuries. Meche Decl. at ¶ 23; Wilson Decl. at ¶ 31.  The 2016 delisting resulted in the removal of federal protections for the LBB's habitat, making it easier for applicants to obtain approval for development projects that can lead to destruction and further fragmentation of bear habitat, which in turn can cause a reduction in population numbers (AR 654; 020082, "Barriers to movement") and diminished opportunities for bear study and observation.

In sum, Plaintiffs have provided specific facts to show particularized, actual and imminent injuries to cognizable interests in the protection of the LBB and its habitat as a consequence of the FWS's premature delisting of the LBB.

## B.  Plaintiffs' Have Shown Injury in a Personal and Individual Way

This court in *PEER* confirmed that the "key requirement" for aesthetic standing requires showing that the plaintiff suffers the injury in a "personal and individual way." *PEER,* 832 F. Supp. 2d at 18. *See also, Glickman,* 154 F.3d. at 434 ("the Supreme Court and this circuit have frequently recognized the injury in fact of plaintiffs who suffered aesthetic injury stemming from the condition and quality, or despoilation, of an environmental area that they used.").

Plaintiffs have demonstrated a personal, historic and cultural relationship with the LBB and its habitat. *See Alaska Oil & Gas Ass'n v. Pritzer,* 2014 WL 3726121 (D. Alaska 2014) (standing supported by the Northern Alaska Plaintiffs historic cultural relationship with the Beringia DPS of seals).  Moreover, contrary to Intervenor's contentions that plaintiffs only utilize "unspecified portions of an immense tract of territory." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990), they have identified specific areas within recognized LBB habitat and

previously designated critical habitat that they use.  Meche Decl. at ¶ 14 ("I grew up learning about the 'Des Ourses bottom' or 'the bear's bottom' in the Cajun fishing culture of the Atchafalaya Basin, an area north of where I was raised, near the Sherburne Wildlife Management area.  The Louisiana black bear has had a significant impact on the local culture of the Atchafalaya Basin."); Wilson Decl. at ¶¶ 17-18 ("I have a strong interest in the native and migratory wildlife of the Atchafalaya Basin . . . .  Over the past thirty-two (32) years, I have spent numerous hours boating and recreating in the Atchafalaya Basin, including in areas previously designated critical habitat for the Louisiana black bear"); Schoeffler Decl. at ¶¶ 4-7 (discussing his long history of involvement with the LBB and its habitat in the Atchafalaya Basin).  The declarants certainly have "at least as much of a direct interest" in the delisting of the LBB as Intervenors.

Plaintiffs' declarations in fact refer to even more specific locations within LBB habitat. Meche Decl. at ¶ 13 (referencing regular visits to the Sherburn Wildlife Management Area, the Atchafalaya National Wildlife Refuge, the Bayou Des Ourses, and the Whiskey Bay Pilot Channel, areas that were part of the LBB's critical habitat designation (AR 249; 009521); Wilson Decl. at ¶ 18 (referencing Bayou Sorrel, Bayou Pigeon, Grand River, Belle River, and the Atchafalaya River areas of the Basin (AR 249; 009520 and 009521).

Plaintiffs' Declarations also make clear that their involvement with the LBB is ongoing and will continue into the future.  Caire Decl. at ¶ 12; Nowak Decl. at ¶ 13 (discussing plans to return to Louisiana for study and observation in June 2019)). Some Plaintiffs and members of Plaintiff organizations regularly work in areas of LBB habitat in the Atchafalaya Basin, and have so for years. Meche Decl. at ¶ 12; Wilson Decl. at ¶¶ 17-19.  *See also* Meche Decl. at ¶¶ 8, 13,

15, 20; Schoeffler Dec. at ¶¶ 4, 9; Wilson Decl. at ¶19.  These are not the "some day" intentions the *Lujan* Court found had failed to support standing. *Lujan,* 504 U.S. at 564.

C. **Plaintiffs' Injuries Are Fairly Traceable to the FWS's Delisting Determination, and Redressable by a Favorable Decision from this Court**

This Court has found that "[c]ausation 'demands a causal connection between the injury and the conduct complained of' or, in other words, 'the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *PEER,* 832 F. Supp. 2d at 18 (quoting *Shays v. Fed. Election Comm'n,* 414 F.3d 76, 83 (D.C. Cir. 2005)).

Here, the conduct complained of is the removal of ESA protections by the Defendants themselves, the very action that is causing Plaintiffs' injuries.  The ESA of course is intended to protect species from threats to their continued existence, thus protecting Plaintiffs' interests in observing, studying, and enjoying the LBB.  16 U.S.C. § 1531(b) (the central purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . .").

While Safari Club argues that some of Plaintiffs' alleged injuries, such as development in areas formerly designated as critical habitat, are due to the independent actions of third parties, standing does not require that defendant's actions be the sole or most immediate cause of the injury. *Bennett v. Spear,* 520 U.S. 154, 168-69 (1997) (finding that the "fairly traceable" requirement does not necessitate "injury as to which the defendant's actions are the very last step in the chain of causation."). Further, "The proper comparison for determining causation is not between what the agency did and the status quo before the agency acted.  Rather, the proper comparison is between what the agency did and what the plaintiffs allege the agency should have done under the statute." *Glickman,* 154 F.3d at 441.

49

There can be no doubt that the loss of critical habitat protections, which forbid any federal action that could jeopardize the species or result in the destruction or adverse modification of its critical habitat, 16 U.S.C. § 1536(a)(4), and which require an ESA consultation with the FWS for any such actions, 16 U.S.C. § 1536(a)(2), makes development in the area of former critical habitat easier and more likely.

Plaintiffs "are not required to 'demonstrate with absolute certainty that the relief requested in their complaint will eliminate the harms they will allegedly suffer,' but must show 'only a substantial likelihood that the judicial relief requested will prevent or redress the[ir] claimed injury.'" *PEER,* 832 F. Supp. 2d at 19.  Moreover, courts have found redressability met where a court order could provide partial relief. *See Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008) (citing *Meese v. Keene*, 481 U.S. 465, 476 (1987) (requiring only partial redressability)).

The grant of the relief sought here, resulting in the relisting of the LBB and consequent re-establishment of its critical habitat, will certainly redress, at least in part, Plaintiffs' injuries stemming from the loss of those protections.

### D.  Organizational Plaintiffs Have Also Met the Elements to Establish Standing

To satisfy Article III standing, an organizational plaintiff must establish that (1) its members have standing to sue in their own right, (2) the interests at stake are germane to the purpose of the organization, and (3) neither the claims nor relief require direct participation of its members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *NRDC v. EPA*, 755 F.3d 1010, 1016 (D.C. Cir. 2014).  Intervenor does not claim that the second and third requirements have not been met here, but rather contests the nature of the injury alleged by declarant members of their respective organizations, as well as causation and redressability – in other words, whether members have standing to sue in their own right.  For

the same reasons discussed above regarding the standing of the declarants, including the

individual Plaintiffs, who are also members of the organizational Plaintiffs, this requirement is

met here.

## CONCLUSION AND REMEDY

As set out above, the FWS delisting of the LBB was arbitrary and capricious and

unsupported by the very scientific authority FWS claimed to rely on.  The agency failed to rely

on the "best scientific and commercial data available," as required by its own delisting

regulations.  The data available demonstrate that the criteria of the Recovery Plan have not been

met because one of the two claimed viable and connected populations is not the listed

subspecies.  Moreover, the ESA delisting criteria have not been met because the FWS failed to

demonstrate that threats to the LBB, including hybridization, have been reduced or eliminated to

the point where it is no longer threatened; failed to consider the impacts on the subspecies of the

immense losses of historic range and population; and failed to demonstrate that existing

regulatory mechanisms are sufficient to protect the LBB without ESA protection.  The delisting

must also be invalidated because the FWS determination that the LARB population is not

threatened or significant for purposes of the Significant Portion of Range analysis is

unsupported.

The delisting rule should be vacated.  The remedy for Plaintiffs' ESA claim is governed

by the APA, which provides that the reviewing court shall "*hold unlawful and set aside* agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2) (emphasis added); *see Citizens to

Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) ("In all cases agency action

must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law' or if the action failed to meet statutory, procedural, or constitutional

requirements"); *see also American Bioscience, Inc. v. Thompson*, 348 U.S. App. D.C. 77, 269

F.3d 1077, 1084 (2001) (APA remedy is normally vacatur of the agency's order).

Although a court may in some instances remand without vacatur, that remedy is reserved

for situations when the defects in the agency's rule are curable and vacatur would defeat the

protection offered by the existing rule. *Humane Soc'y,* 865 F.3d at 614.  That clearly is not the

case here since the delisting rule removed all ESA protections for the LBB and its habitat, and

vacating the delisting would return them.  Where there are serious deficiencies in the agency's

decision-making and no materially disruptive consequences, vacatur is the correct remedy. *Id.* at

615.

Accordingly, the Court should deny the FWS and Safari Club's Motions for Summary

Judgment, grant the Plaintiffs' Motion for Summary Judgment, and vacate the delisting rule.

Respectfully submitted this 25th day of June 2019.

      /s/ *Paula Dinerstein*
Paula Dinerstein
D.C. Bar No. 333971
Peter Jenkins
D.C. Bar No. 477229
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring MD  20910
Phone: 202-265-7337
Email   pdinerstein@peer.org
pjenkin@peer.org
*Attorneys for Plaintiffs*

*/s/ Misha L. Mitchell*
Misha L. Mitchell
La. Bar. No. 37506
Atchafalaya Basinkeeper
47 Mt. Laurel Ave
Birmingham, AL 35242
Phone: (225) 692-1133

Fax: (225) 692-4114
basinkeeperlegal@gmail.com
*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Opposition to Defendants' and Safari Club International's Motions for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment was served upon all counsel of record through the ECF system this 25th day of June 2019.


/s/ Paula Dinerstein
Paula Dinerstein