UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY,
et al.,

    Plaintiffs,

        v.

DAVID BERNHARDT, in his official
capacity as Secretary, U.S. Department of
Interior, et al.,

    Defendants.

Civil No. 18-1547 (JDB)

## MEMORANDUM OPINION

In 1992, the Fish and Wildlife Service ("the Service") listed the Louisiana black bear ("LBB") as a "threatened species" under the Endangered Species Act ("ESA"). The Service determined in 2016 that the bear had recovered and no longer qualified as threatened, and it was therefore delisted. Plaintiffs, a collection of non-profit organizations and individuals who assert an interest in the LBB and its habitat, dispute the Service's determination and challenge the decision to delist the LBB. Now before the Court are plaintiffs' motion for summary judgment and the government's and intervenor-defendant Safari Club International's cross-motions for summary judgment. Upon consideration of the parties' submissions and the entire record, the Court concludes that plaintiffs have failed to satisfy the requirements of Article III standing. Accordingly, the Court will dismiss the case without prejudice for lack of jurisdiction.

1

## Background

### A. The Louisiana Black Bear

The LBB is a subspecies of the American black bear. See Removal of the Louisiana Black Bear From the Federal List of Endangered and Threatened Wildlife and Removal of Similarity-of-Appearance Protections for the American Black Bear("Delisting Rule"), 81 Fed. Reg. 13,124, 13,124 (March 11, 2016). LBBs are "huge, bulky mammal[s] with long black hair" and yellowish-brown muzzles; they sometimes present with a white patch on their lower throat and chest. Threatened Status for the Louisiana Black Bear and Related Rules ("Listing Rule"), 57 Fed. Reg. 588, 588 (Jan. 7, 1992). While LBBs "are not readily visually distinguishable from other black bear[s]," Delisting Rule at 13,125, they are morphologically characterized by their "relatively long, narrow, and flat" skulls and "proportionately large molar teeth," Listing Rule at 588. Male LBBs usually weigh about 300 pounds, with females weighing in at around 150 pounds. Delisting Rule at 13,125.

LBBs are habitat generalists—they can and do survive in a variety of habitats, including "marsh, upland forested areas, forested spoil areas along bayous, brackish and freshwater marsh, salt domes, and agricultural fields." Delisting Rule at 13,126. The LBB historically lived in many of these sorts of habitats in Louisiana (as implied by the name "Louisiana black bear"). Id. The bear was also known to live in parts of southern Mississippi and eastern Texas. Id. at 13,126–27. Beginning in the 1700s and 1800s, however, hunting and deforestation narrowed the habitable land available to the LBB. Id. By 1992, agricultural land clearing had further reduced LBB habitat by more than 80 percent, and what habitat remained was "degraded by fragmentation." Id. at 13,127. As a result of this habitat loss, in 1992, only 80 to 120 LBBs were estimated to remain in Louisiana, 25 in Mississippi, and none at all in Texas. Id.

## B. The 1992 Listing and Subsequent Developments

Under the ESA, the Secretary of the Interior—and through him, the Service—is charged with conserving endangered and threatened species. 16 U.S.C. § 1531(b). One means of satisfying that charge is to add or remove species like the LBB from the Federal Lists of Endangered and Threatened Wildlife and Plants. See 16 U.S.C. § 1533. A species is "endangered"—and should thus be listed—if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). Similarly, a species is "threatened" if it "is likely to become an endangered species within the foreseeable future." Id. § 1532(20). In determining whether a species is threatened or endangered, the Service must consider several statutory factors, including "the present or threatened destruction" of the species' habitat and "the inadequacy of existing regulatory mechanisms." Id. § 1533(a)(1).

In 1992, concerned by the LBB's habitat losses and low population numbers, the Service determined that the LBB met the statutory definition of "threatened" and issued a final rule listing the LBB. Listing Rule at 592. The main threats to the LBB, according to the Service, were (1) past habitat losses from the conversion of land for agricultural or other non-timberland purposes; (2) possible future habitat losses in privately owned areas; and (3) the inadequacy of existing regulatory mechanisms. Listing Rule at 590–91. The Rule noted that illegal killing by humans posed a secondary threat to the LBB. Id. at 591.

The Rule also discussed whether hybridization was a threat to the LBB. Id. at 591–92. The Rule explained that in the 1960s, about 160 American black bears from Minnesota had been introduced into LBB habitat. Id. It then considered whether cross-breeding between the LBB and those Minnesota bears was a threat to the species, ultimately concluding that such hybridization

3

was not a threat, because the extant populations of LBBs were "probably intraspecifically hybridized" already. Id. at 592. The important thing was to "protect[] the taxon now distinguished by cranial features." Id. Because "genetic investigations did not identify real differences" between the LBB and the Minnesota bear, the Service concluded that hybridization was not likely to dilute or threaten the LBB taxon. See id.

As required by statute, after it listed the LBB, the Service developed and approved a recovery plan for the LBB. See Louisiana Black Bear Recovery Plan ("Recovery Plan"), FWS002595 (Sept. 27, 1995). The plan stated that the recovery objective was "[d]elisting," and provided three criteria for delisting the LBB: (1) the existence of "[a]t least two viable subpopulations, one each in the Tensas and Atchafalaya River Basins"; (2) the "[e]stablishment of immigration and emigration corridors between the two subpopulations"; and (3) "[l]ong-term protection of the habitat and interconnecting corridors that support each of the two viable subpopulations." Id. at FWS002600, 2615. Once the plan was approved, the Service worked to implement it, with the goal of satisfying each of the plan's three criteria. During the implementation period, the Service published a final rule designating approximately 1,195,800 acres as "critical habitat" for the LBB. See Designation of Critical Habitat for the Louisiana Black Bear, 74 Fed. Reg. 10,350 (Mar. 10, 2009).

In 2007, the Service initiated a "5-year review" of the LBB's status to "ensure that the classification of [the] species" as threatened remained "accurate." 5-Year Review of Nine Southeastern Species, 72 Fed. Reg. 42,425 (Aug. 2, 2007). The results of that review were published in early 2014. See 5-Year Review, FWS016804. The review concluded that between 76% and 100% of the Recovery Plan's objectives had been met, noting that all three LBB populations existing at the time of listing were increasing, new breeding populations had appeared,

4

and "significant progress in habitat restoration and protection" had been made. Id. at FWS016806, 16814.

### C. The 2016 Delisting

On March 11, 2016, twenty-four years after the LBB was listed, the Service published a final rule delisting the LBB. See Delisting Rule at 13,124. In the Delisting Rule, the Service determined that the LBB had recovered because all substantial threats had been eliminated or reduced and all recovery criteria in the Recovery Plan had been met; thus, the LBB no longer met the definition of a threatened species. Id. at 13,133–38. The Rule emphasized that (1) habitat, forest restoration, and breeding habitat had increased significantly since the time of listing, id. at 13,159; (2) hunting, commercial use, disease, and predation continued not to be serious threats to the LBB, id. at 13,159–60; and (3) many state and federal protections would remain in place after delisting, including the Clean Water Act, permanent conservation easements, state protections analogous to those under the ESA, and state management plans for maintaining LBB habitat, id. at 13,160–64.

The Service also returned to the question whether hybridization was a threat to the LBB. It acknowledged that the Upper Atchafalaya River Basin ("UARB") subpopulation showed some "genetic affinity" to Minnesota bears, but concluded that such affinity "is not sufficient evidence for determining taxonomic status." Id. at 13,165. Moreover, the Service noted that a recent study validated its assumption at the time of listing that the whole LBB population was to some extent already hybridized, and so the notion that a "pure" LBB genetic strain existed anywhere was likely mistaken. Id. Indeed, the Service determined that, rather than threatening the LBB, genetic exchange "among bears from Louisiana, Mississippi, and Arkansas can be considered a positive genetic and demographic contribution" to the LBB subspecies. Id. (emphasis added).

5

In addition to delisting the LBB, the Delisting Rule also rescinded the critical habitat designation from 2009. See id. at 13,171.

### D. This Lawsuit

Plaintiffs filed this lawsuit on June 28, 2018, challenging the Service's conclusions in the Delisting Rule that the LBB is recovered and no longer meets the definition of a "threatened species" under the ESA. See, e.g., Compl. [ECF No. 1] ¶¶ 76–101. Plaintiff's complaint seeks a declaration that the Delisting Rule was issued in violation of law and vacatur of the Rule. Id. at 34. On January 4, 2019, Safari Club International moved to intervene; the Court granted that motion on March 22, 2019. Order of March 22, 2019 [ECF No. 22] at 5–6. Plaintiffs, the government, and Safari Club have each moved for summary judgment. Pls.' Mot. for Summ. J. ("Pls.' MSJ") [ECF No. 24]; Safari Club Int'l's Cross-Mot. for Summ. J. and Resp. in Opp'n to Pls.' Mot. for Summ. J. ("Safari Club MSJ") [ECF No. 25]; Fed. Defs.' Cross-Mot. for Summ. J. ("Gov't MSJ") [ECF No. 27].

## Discussion

Only Safari Club, not the government, raises the issue of standing. But the Court cannot evaluate the merits of plaintiffs' claims without first ensuring that plaintiffs have standing. See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d 1279, 1289 (D.C. Cir. 2007). To establish standing under Article III, a party must show (1) injury in fact that was (2) caused by the conduct of the defendants and that (3) can be redressed by judicial relief. Id. "The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411–12 (2013). In evaluating that evidence concerning standing, courts "assume that on the merits the plaintiffs

would be successful in their claims." Pub. Citizen, 489 F.3d at 1289. In cases like this one, where "the parties invoking federal jurisdiction are not the object of the government action or inaction they challenge," standing is "substantially more difficult to establish." Id. (internal quotation marks omitted).

Where a case involves multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief." Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017). Here, all the plaintiffs—the individual and the organizational plaintiffs—seek the same form of relief for each claim. Therefore, if any one of the plaintiffs has standing, the Court can proceed to the merits. If standing rests on an organizational plaintiff bringing suit on behalf of its members, however, additional requirements apply. In order to bring such a suit, an organization must show that (1) "its members would otherwise have standing to sue in their own right," (2) the interests the organization is seeking to protect "are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." Defs. of Wildlife v. Perciasepe, 714 F.3d 1317, 1323 (D.C. Cir. 2013).

The Court begins with the injury-in-fact requirement. Injury in fact is the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." Clapper, 568 U.S. at 409. Accordingly, an allegation of future injury must either be "certainly impending" or there must be a "substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). Where the latter sort of "risk of harm" claim is at issue, the D.C. Circuit has instructed that the "proper way" to analyze such a

7

claim is through the lens of imminence: to "consider the ultimate alleged harm—such as death, physical injury, or property damage from car accidents—as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." Pub. Citizen, 489 F.3d at 1298. A plaintiff can satisfy that requirement by showing "both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." Id. at 1295. In environmental cases like this one—keeping in mind the imminence requirements just explained—a plaintiff can satisfy the injury-in-fact requirement by "adequately show[ing] that he or she has an aesthetic or recreational interest in a particular place or animal, and that interest is impaired by a defendant's conduct." Humane Soc'y of the U.S. v. Jewell, 76 F. Supp. 3d 69, 106 (D.D.C. 2014).

The Court has reviewed the complaint, briefing, and affidavits submitted by plaintiffs in support of summary judgment and discerned four possible injuries, which will be addressed in turn. First, one plaintiff claims in his affidavit that delisting will lead to the LBB being "reduced in numbers or distribution," which will in turn make it more difficult "to observe and study the Louisiana black bear and its habitat." See Decl. of Dr. Ronald M. Nowak ("Nowak Decl.") [ECF No. 24-4] ¶ 14. The problem with this claim is that, while plaintiffs' aesthetic interest in the LBB could conceivably support an injury in fact, plaintiffs have not provided the Court with any evidence whatsoever demonstrating that delisting will lead inexorably to fewer LBBs or make it harder to observe LBBs in the wild. It is not self-evident what the result of delisting will be for LBB population levels. The Delisting Rule itself notes that the main LBB subpopulations "are stable or increasing," and that the probability of long-term persistence is 99.6%. Delisting Rule at 13,167.

In support of their claim about the negative effects of delisting on population levels, plaintiffs could have submitted population-modeling data, data showing what occurred to the populations of other species following delisting, or some other facts demonstrating a link between delisting and population decreases. Cf. Jewell, 76 F. Supp. 3d at 108 (concluding that plaintiffs challenging delisting had standing where they provided data showing that population of gray wolves would decrease upon delisting). But plaintiffs submitted no such data to the Court. As a result, there are no facts in the record to show that the Delisting Rule will "actually" cause the claimed harm, much less that the harm will follow "imminently" from the delisting. Cf. Humane Soc'y of the U.S. v. Babbitt, 46 F.3d 93, 97 (D.C. Cir. 1995) (concluding that plaintiffs had failed to show injury in fact where declaration did not set forth facts showing that declarant's ability to observe and study a species was actually reduced by the Service's action). Without facts to support it, plaintiffs' claim that "[t]he loss of ESA protections results in the likelihood of there being fewer bears to observe, study, and enjoy," Opp'n to Defs.' & Safari Club Int'l's Mots. for Summ. J. & Reply in Support of Pls.' Mot. for Summ. J. ("Pls.' Reply") [ECF No. 30] at 45, is nothing more than a mere allegation.[1] Mere allegations do not satisfy the injury-in-fact requirement at the summary judgment stage of litigation.

Second, two plaintiffs claim that their ability to view "true native" LBBs will be harmed by hybridization of the LBB and the Minnesota bears.[2] See, e.g., Nowak Decl. ¶ 16 ("The delisting

---

[1] Plaintiffs' reply brief cites a number of instances where the administrative record documents various causes of bear deaths, presumably as proof that delisting will lead directly to more bear deaths. Pls.' Reply at 45–46. But none of those locations in the administrative record make any reference to whether the causes of death were affected by the fact that the LBB was listed. For example, at FWS020040, a Service employee emailed another Service employee a summary of "observed bear mortality during 1992–2015." Some of the causes of death were vehicle collisions or illegal kills. Id. Nothing in the email, however, suggests that the fact that the LBB was listed during that time period had any effect on the total number of bear deaths, or that delisting the bear would make deaths from those sources more likely. See id.

[2] For purposes of this standing analysis, the Court assumes that plaintiffs are correct that it is possible to draw a distinction between "true" LBBs and the bears in the UARB population, which plaintiffs claim are some mixture of true LBB and American black bears.

9

decision took away necessary protections for the remaining luteolus populations and their habitat, and allows for the continued exposure of true native luteolus to the risks of hybridization with an introduced, non-native americanus population in the [UARB].");  Decl. of Dr. Michael J. Caire ("Caire Decl.") [ECF No. 24-2] ¶ 15 (same).  The extent of the facts provided to the Court are (1) Minnesota bears were at some point introduced into the UARB prior to listing, see Caire Decl. ¶ 14; (2) true LBB subpopulations are currently exposed to the Minnesota bears, see id.; and (3) that exposure presents "risks of hybridization," id. ¶ 15.  On plaintiffs' own account, then, the hybridization that they are concerned about began when the Minnesota bears were introduced into the UARB in the 1960s and was then actually exacerbated by the actions taken by the Service during the time that the LBB was listed.  See, e.g., Pls.' MSJ at 19 (arguing that the Service's "efforts to interconnect populations as part of its Recovery Plan actually further threaten the LBB's survival as a subspecies by facilitating hybridization" with Minnesota bears).

Some risk of LBBs hybridizing with Minnesota bears in the UARB, then, existed long before delisting (or even listing).  Plaintiffs' briefing makes clear that the specific claim here is that delisting increases the risk of harm from hybridization beyond the risk that already existed. See Pls.' Reply at 46 (arguing that delisting presents "increased risks of hybridization").  The aesthetic interest in viewing "true" LBBs is one that (like the first potential injury) conceivably could satisfy the injury-in-fact requirement.  But to establish standing, plaintiffs must demonstrate, through evidence in the record, that harm to that aesthetic interest is "actual or imminent."  Lujan, 504 U.S. at 560.  Plaintiffs make no attempt to show "actual" harm—that hybridization has actually increased since delisting.  They instead rely on imminence.  To show imminence for this increased-risk-of-harm claim at the summary judgment stage, plaintiffs must set forth specific facts demonstrating that (1) the action being challenged—the delisting of the LBB—substantially

increases the risk of hybridization and (2) that there is a substantial probability of hybridization occurring. See Pub. Citizen, 489 F.3d at 1295; id. at 1296 ("[T]he constitutional requirement of imminence . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'"); Food & Water Watch, Inc. v. Vilsack, 79 F. Supp. 3d 174, 189 (D.D.C. 2015) ("[A] plaintiff must ordinarily show that the defendant's action has made it much more likely that the harm plaintiff fears will occur than would otherwise be the case.").

Even if the Court were to assume that plaintiffs had satisfied the second prong and shown a substantial probability of hybridization, plaintiffs still have not demonstrated that delisting substantially increases the risk of such hybridization. See Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 915 (D.C. Cir. 2015) ("A failure to satisfy either of these prongs would deprive [the] Court of jurisdiction to hear Plaintiffs' case."). The Court cannot simply accept at face value plaintiffs' assertion that delisting will somehow create new or increased risks of hybridization. Cf. Pub. Citizen, Inc. v. Trump, 297 F. Supp. 3d 6, 30 (D.D.C. 2018) (concluding that plaintiffs had not met two-part test where they had "not averred or offered any evidence about [their] current risk of exposure or about the degree to which the [agency action] would decrease that risk"); Fed. Forest Res. Coal. v. Vilsack, 100 F. Supp. 3d 21, 44–45 (D.D.C. 2015) (concluding that plaintiffs had failed to demonstrate that agency action barring certain timber harvesting "substantially increased [the] risk of wildfires," where plaintiffs had presented nothing more than "historical figures showing that wildfires have increased as timber harvesting has decreased"); Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ., 48 F. Supp. 3d 1, 11 (D.D.C. 2014) ("[P]laintiffs provide no evidence—not even any allegations—about how much more likely they are to be the victims of identity fraud now than before the passage of the Final Rule, and they provide absolutely no information about the absolute risk that their information will be used improperly."); Carik v. U.S.

11

Dep't of Health & Human Servs., 4 F. Supp. 3d 41, 53 (D.D.C. 2013) (concluding that plaintiffs had failed to show a substantial increase in risk where they had "not attempted to quantify the increased risk of physical injury from [the agency action]").

Plaintiffs' affidavits are entirely devoid of any facts supporting the assertion that delisting will make hybridization worse. The affidavits contain no facts, for instance, showing that as a result of delisting the LBB, Minnesota bears will have greater access to true LBBs than they did during listing, or are more likely to breed with LBBs, or that some other factor will increase the rate of hybridization. Without facts of that sort, plaintiffs have not shown that hybridization is the "imminent" result of delisting, and that claim fails to satisfy the injury-in-fact requirement.[3]

The third potential injury, claimed by two organizational plaintiffs on behalf of their members, is that delisting of the LBB will subject habitat areas upon which they depend for commercial, recreational, and aesthetic purposes "to increased development and impairment." Decl. of Jody Meche ("Meche Decl.") [ECF No. 24-3] ¶ 16; see Decl. of Dean Wilson ("Wilson Decl.") [ECF No. 24-6] ¶ 22 ("[W]ithout protections for critical bear habitat, areas that support the Basin populations of Louisiana black bear are no longer protected from development."). An assertion of lost enjoyment of lands because of increased development can, in appropriate circumstances, support standing. See Sierra Club v. Jewell, 764 F.3d 1, 5–6 (D.C. Cir. 2014).

But this claim faces several hurdles here. To begin with, "the relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000). The organizational plaintiffs must therefore show that their members would personally be affected by

---

[3] Nor can the "increased risk of hybridization" itself, rather than the actual harm from imminent hybridization, satisfy the injury-in-fact requirement. Clear D.C. Circuit precedent instructs that "the mere increased risk of some event occurring is utterly abstract—not concrete, direct, real, and palpable." Pub. Citizen, 489 F.3d at 1297.

12

development resulting from delisting, which would require them to identify "specific areas" of the Atchafalaya Basin that they personally use in which development would harm their interests. Friends of the Earth v. U.S. Dep't of Interior, 478 F. Supp. 2d 11, 17–18 (D.D.C. 2007) (concluding that an injury has been alleged where a declaration identifies "specific areas" of affected national parks, such as specific hiking trails, but has not been alleged where a declaration "simply contains a list of parks and a list of general injuries"). Moreover, those areas must be land that was previously designated as critical habitat—otherwise, any development there could not be the result of delisting.

A significant portion of the organizational plaintiffs' declarations assert an interest only in the Atchafalaya Basin generally, without identifying portions of the Basin that they use that were previously designated as critical habitat. See, e.g., Meche Decl. ¶ 8 ("I have been making a living in the Atchafalaya Basin my entire life, and I plan to continue to use the Basin in both my work and recreational activities."); Wilson Decl. ¶ 17 ("I have a strong interest in the native and migratory wildlife of the Atchafalaya Basin as a resident of the Basin . . . ."). These sorts of broad, general assertions will not suffice: the Basin is a massive 1.2 million–acre area that encompasses LBB habitat as well as enormous regions of land which are not LBB habitat. See FWS008522. Only about half of that land—567,000 acres—was designated as critical habitat in the Service's 2009 habitat designation. See 74 Fed. Reg. 10,350, 10,368–69 (March 10, 2009). The Court cannot simply extrapolate from an assertion that plaintiffs use the Basin generally that they also use previously designated lands within the Basin. See Friends of the Earth, 478 F. Supp. 2d at 18 (noting that it is not the Court's role "to connect the dots and assume that an affiant has sworn to things that are not stated in the affidavit").

13

Some of the assertions in the declarations fare better on this front, however. For instance, on behalf of the Atchafalaya Basinkeeper organization, declarant Dean Wilson avers that he has "spent numerous hours boating and recreating in the Atchafalaya Basin, including in areas previously designated critical habitat for the Louisiana black bear," and that he "intend[s] to continue to visit, work and recreate in these areas." Wilson Decl. ¶¶ 18–19. Likewise, declarant Jody Meche, on behalf of the Louisiana Crawfish Producers Association-West, avers that she "intend[s] to continue using the Basin to advance [her] economic, recreational, cultural, and aesthetic interests, including . . . areas formerly designated as critical habitat." Meche Decl. ¶ 20. These statements are sufficient to show that, through their members, the organizational plaintiffs have a personal stake in at least some of the area affected by the Delisting Rule.

The next question is whether organizational plaintiffs have set forth facts to show "actual or imminent" harm. As for actual harm, although plaintiffs list a number of development projects that have occurred since delisting, some of which were in previously designated areas, see, e.g., Wilson Decl. ¶¶ 23–24, they fail to set forth facts demonstrating a personal connection to those areas. The closest either organizational plaintiff comes to showing actual harm is in the Meche Declaration. Meche states that she is a fisherman who "work[s] and live[s] in the geographic area" of the LBB habitat, and that one of the development projects "impair[s] water quality, and other wildlife habitat in the Atchafalaya Basin, which affects the health of [the] fisheries." Meche Decl. ¶¶ 12, 17. But in addition to the fact that Meche does not say whether that development project or the fisheries that it affected were located in previously designated lands, she also doesn't specify whether it affected any fisheries that she personally uses. These omissions are fatal to her claim of actual harm. Cf. Friends of the Earth, 528 U.S. at 181–82 (concluding that plaintiffs had demonstrated sufficient personal injury where they showed, for example, that they "lived a half-

14

mile from [the affected area]," and would like to engage in recreation "between 3 and 15 miles downstream from the [affected area]").

Because plaintiffs have not demonstrated that they have actually been harmed by a post-delisting development project, plaintiffs must argue that harm is "imminent." But they have not claimed that development is "certainly impending." Instead, they argue that delisting creates an increased risk of harm from development. As before, then, plaintiffs must set forth facts sufficient to meet the two-pronged increased-risk-of-harm test. Here, that test requires them to show both (1) that the delisting creates a substantially increased risk of harm to their interests resulting from development, and (2) that there is a substantial probability that that harm will occur. See Pub. Citizen, 489 F.3d at 1295.

Once again, plaintiffs have provided the Court only with conclusory allegations that delisting increases the risk of harmful development. For instance, Wilson states that "the Basin populations of Louisiana black bear are no longer protected from development." Wilson Decl. ¶ 22. But, as the Delisting Rule and Safari Club both point out, the ESA was only one in a constellation of federal and state regulations and private agreements that protected the LBB habitat, the rest of which remain in effect post-delisting. See Delisting Rule at 13,164; Safari Club MSJ at 13, 26–27. Moreover, the ESA itself does not even ban development on critical habitat land; instead, it requires federal agencies to ensure that developments they authorize are not likely to "result in the destruction or adverse modification of habitat of [protected] species." 16 U.S.C. § 1536(a)(2). Plaintiffs make no attempt to explain how common development was during listing, how likely it is that development will result in harm to their aesthetic interests, or the degree to which delisting increased any such risk. And they similarly do not explain whether the development projects they do identify, such as the Bayou Bridge Pipeline, could have gone

15

forward even if the LBB had remained listed, or whether similar projects had been completed while the LBB was listed. Without crucial facts about the "current risk" or increased risk resulting from delisting, plaintiffs have not established imminence, and therefore have not established injury in fact. See Pub. Citizen, 297 F. Supp. 3d at 30.

Although not mentioned in plaintiffs' briefing, it is possible to read the organizational plaintiffs' declarations as asserting a fourth potential injury in support of the organizations' standing in their own right (as opposed to standing on behalf of their members). The injury would be that, as a result of the delisting decision, the organizations have had to devote resources to challenging development projects in the Basin like the Bayou Bridge pipeline. Wilson Decl. ¶ 23. To show injury in fact based on the expenditure of organizational resources, an organization must set forth facts that the challenged agency conduct "perceptibly impaired [its] ability to provide services" by causing "an inhibition of [the organization's] daily operations." Food & Water Watch, 808 F.3d at 919.

The Court concludes that the organizational plaintiffs have not put forth sufficient facts to show that the delisting decision has somehow impaired their ability to provide services or inhibited their daily operations. To be sure, plaintiffs have stated that they spent money on litigation to challenge the Bayou Bridge pipeline and other developments in the Basin. Wilson Decl. ¶¶ 23–24. But they have not "provide[d] evidence that these . . . expenses were beyond those normally expended." Friends of Animals v. Zinke, 373 F. Supp. 3d 70, 90 (D.D.C. 2019). For instance, there is no allegation that these development projects were actually caused by the delisting or would not have gone forward even if the LBB had remained listed, or that plaintiffs expended more money litigating than they would have absent the delisting. Nor can the organizational plaintiffs establish an injury merely by implying that they have had to "divert[] resources from one

16

priority to another" where their service activities have not been directly impeded. Long Term Pharmacy All. v. UnitedHealth Grp., Inc., 498 F. Supp. 2d 187, 192 (D.D.C. 2007).

As for the claim that the delisting decision has affected the organizations' general advocacy efforts, as opposed to their service activities, binding case law provides that "an organization's use of resources for litigation . . . or advocacy is not sufficient to give rise to an Article III injury." Food & Water Watch, 808 F.3d at 919–20. In other words, "when the only 'injury' arises from the effect of the regulations" on advocacy efforts, there is no standing. Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1161–62 (D.C. Cir. 2005). The mission of the organizational plaintiffs here, which reflects their advocacy goals, is to "preserve and restore the ecosystems of the Atchafalaya Basin" and to inform "members and the general public of projects, activities, or actions that may adversely affect the Basin." See Wilson Decl. ¶¶ 5, 9; see also Meche Decl. ¶ 6 ("At the core of [the Louisiana Crawfish Producers Association-West's] mission is our collective advocacy, outreach, and public education to keep local residents, agencies, and government officials informed of the goings-on in the Basin . . . ."). Pursuant to this mission, plaintiffs monitor Basin lands so that they can report back to the public about potential threats to the Basin, see Wilson Decl. ¶¶ 9–10, and "engage in public and legal advocacy to prevent harmful development," Meche Decl. ¶ 6. Plaintiffs claim that this monitoring and advocacy work has been disrupted by the delisting decision. See Wilson Decl. ¶ 26. Although "the line between advocacy and non-advocacy services can be blurry" in some cases, Tex. Low Income Housing Info. Serv. v. Carson, 2019 WL 6498816, at *6 (D.D.C. 2019), here the Court is convinced that plaintiffs' monitoring and advocacy efforts "relate directly and exclusively to pure issue-advocacy," Friends of Animals, 373 F. Supp. 3d at 90. As a result, harm to this activity does not suffice to create standing.

Plaintiffs argue that it would be unfair for the Court to conclude that they lack standing, given that the Court determined that Safari Club had a "legal interest" in the case when it granted Safari Club's motion to intervene to defend the Delisting Rule in order to protect its members' interest in hunting black bears. See Pls.' Reply at 40. How can Safari Club have an interest sufficient to defend the rule, plaintiffs ask, yet plaintiffs not have standing to challenge the rule? This argument elides a key difference between the positions of the parties. If the Court vacates the Delisting Rule, it necessarily follows that the LBB will be relisted, and that there will thus be a complete ban on hunting the LBB in Louisiana. Safari Club's members indicated that they "plan to hunt black bear in Louisiana during the first season that the Louisiana Department of Wildlife and Fisheries establishes a season for black bear." Declaration of Melissa Evans Elliott [ECF No. 13-3] ¶ 10. While Louisiana has not yet authorized hunting, it has indicated that it "may" consider bear harvests "as a management action" (though Louisiana emphasized that "if proposed harvests may impede sustainability, then no harvests will be allowed"). FWS 018842. Safari Club's members, therefore, set forth specific facts establishing that they had a legal interest (potentially hunting black bears) in the suit that would likely be impaired if the LBB were relisted. See Order of March 22, 2019 at 5–6. On the other hand, the injuries asserted by plaintiffs—for example, a decline in opportunities to view LBB or hybridization of the LBB with Minnesota bears—do not necessarily follow from delisting. As a result, plaintiffs needed to put forth specific facts showing that these harms would result from delisting. They have failed to satisfy that burden.[4]

---

[4] Likewise, plaintiffs' argument that the Court should ask "if Plaintiffs lack standing, is there anyone else who could have standing under Safari Club's test" is unavailing. Pls.' Reply at 43. "[T]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." Clapper, 568 U.S. at 420. Moreover, here it simply is not the case that it is impossible for anyone to challenge the Delisting Rule. The Court has emphasized throughout this opinion that its conclusion that plaintiffs lack standing is the result of plaintiffs' failure to set forth specific facts to support a finding of injury in fact, no more and no less.

## Conclusion

For the foregoing reasons, the Court will dismiss the case without prejudice for lack of jurisdiction and deny as moot the parties' motions for summary judgment. A separate order will be issued on this date.

/s/<br>
JOHN D. BATES<br>
United States District Judge

Dated: February 7, 2020